## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**LEGENDS COLLISION CENTER, LLC, et al.,**
    **Plaintiffs,**

**v.**
                               **Case No. 6:14-cv-6006-Orl-31-TBS**
                               **MDL Case No. 6:14-md-2557-GAP-TBS**

**STATE FARM MUTUAL AUTOMOBILE**
**INSURANCE COMPANY, et al.,**
    **Defendants**

## FIRST AMENDED COMPLAINT
## JURY TRIAL DEMANDED

COMES NOW, the above-captioned Plaintiffs, pursuant to this Court's August 17, 2015 Order (Doc. 222, 6:14-md-2557), the Federal Rules of Civil Procedure, and other applicable authority, file their First Amended Complaint against the above-captioned Defendants and, in support thereof, state the following:

### AMENDMENTS TO THE PARTIES

1.     Raintree Auto Body, Inc. is withdrawn as a Plaintiff.

2.     Orlando Auto Body, Inc. is withdrawn as a Plaintiff.

3.     Encompass Insurance Company of America is being added as a Defendant.

4.     Mercury Casualty Company is being added as a Defendant.

### PARTIES

5.     Plaintiff Legends Collision Center, LLC ("Legends"), is an Arizona limited liability corporation with its principle place of business located at 7015 S. Harl Avenue, Tempe, Arizona 85283.  Legends is authorized to transact auto collision business in the State of Arizona.

6.     Plaintiff Jan's European Auto Body, Inc. (d/b/a Jan's Spectrum Collision Center) ("Jan's Spectrum") is an Arizona corporation with its principle place of business located at 640

South Smith Road, Tempe, Arizona 85281. Jan's Spectrum is authorized to transact auto collision business in the State of Arizona.

7.      Plaintiff Airport Enterprises, Inc. (d/b/a Airport Auto Center) ("Airport Auto") is an Arizona corporation with its principle place of business located at 4040 E. Washington St, Phoenix, Arizona 85034.  Plaintiff Airport Auto is authorized to transact auto collision business in the State of Arizona.

8.      Plaintiff Robert K. Isham ("Isham") is the former owner of New Image Paint & Body Shop, Inc. (f/k/a New Image Paint and Body Shop, Inc.), which was sold on December 31, 2012. Prior to December 31, 2012, New Image Paint & Body Shop, Inc.'s principle place of business was in Tempe, Arizona and was authorized to transact auto collision business in the State of Arizona. New Image Paint & Body Shop, Inc. continues to transact auto collision business in the State of Arizona and maintains the same principle place of business in Tempe, Arizona; however, Isham is only seeking damages prior to December 31, 2012.

9.      Plaintiffs Legends, Jan's Spectrum, Airport Auto and Isham are collectively referred to herein as "Plaintiffs."

10.     Defendant State Farm Mutual Automobile Insurance Company is an Illinois insurance company with its principle place of business in Bloomington, IL. Defendant State Farm Mutual Automobile Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant State Farm Mutual Automobile Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

11.     Defendant State Farm Fire and Casualty Company is an Illinois insurance company with its principle place of business in Bloomington, IL. Defendant State Farm Fire and Casualty Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant State

2

Farm Fire and Casualty Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

12.    Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company are part of the State Farm corporate family.[1]  Unless otherwise noted, these particular defendants are collectively referred to herein as "State Farm Defendants."

13.    Defendant Farmers Insurance Company of Arizona is an Arizona insurance company with its principle place of business in Phoenix, AZ. Defendant Farmers Insurance of Arizona is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Defendant Farmers Insurance Company of Arizona may be served with process through its statutory agent, Corporation Services Company, 2338 West Royal Palm Road, Suite J, Phoenix, Arizona 85021.

14.    Defendant Farmers Insurance Exchange is a California insurance company with its principle place of business in Los Angeles, CA. Defendant Farmers Insurance Exchange is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Farmers Insurance Exchange may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

15.    Defendant Zurich American Insurance Company is a New York insurance company with its principle place of business in Schaumburg, IL. Defendant Zurich American Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Zurich American Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

16.    Defendants Farmers Insurance Company of Arizona and Farmers Insurance Exchange are part of Farmers Insurance Group of Companies.[2]  Farmers Insurance Group of

---

[1] *See* https://www.statefarm.com/about-us/company-overview/company-profile/state-farm-companies (last accessed September 16, 2015).

[2] *See* http://www.farmers.com/companies/state/

3

Companies and Zurich American Insurance Company owned by Zurich Insurance Group.[3]  Unless otherwise noted, these particular defendants are collectively referred to herein as "Farmers Defendants."

17.     Defendant Progressive Preferred Insurance Company is an Ohio insurance company with its principle place of business in Mayfield Village, OH. Defendant Progressive Preferred Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Progressive Preferred Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

18.     Defendant Progressive Advanced Insurance Company is an Ohio insurance company with its principle place of business in Cleveland, OH. Defendant Progressive Advanced Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant  Progressive Advanced Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

19.     Defendant Progressive Casualty Insurance Company is an Ohio insurance company with its principle place of business in Cleveland, OH. Defendant Progressive Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Progressive Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

20.     Defendants Progressive Preferred Insurance Company, Progressive Advanced Insurance Company and Progressive Casualty Insurance Company are subsidiaries of Progressive

---

[3]https://www.zurich.com/2012/en/annualreport/financialinformation/notes/notes21-30/30significantsubsidiaries.html and http://www.farmers.com/exchange/

Corporation.[4]  Unless otherwise noted, these particular defendants are collectively referred to herein as "Progressive Defendants."

21.     Defendant GEICO Casualty Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO Casualty Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant GEICO Casualty Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

22.     Defendant GEICO General Insurance Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO General Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant GEICO General Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

23.     Defendant GEICO Indemnity Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO Indemnity Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant GEICO Indemnity Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

24.     Defendant Government Employees Insurance Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant Government Employees Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Government Employees Insurance Company may be served with process

---

[4] See http://www.sec.gov/Archives/edgar/data/80661/000119312510044296/dex21.htm

through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

25.     Defendants GEICO General Insurance Company, GEICO Indemnity Company and Government Employees Insurance Company are all indirectly owned subsidiaries of Berkshire Hathaway, Inc.[5]  Unless otherwise noted, these particular defendants are collectively referred to herein as "GEICO Defendants."

26.     Defendant Allstate Fire and Casualty Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Fire and Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Allstate Fire and Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

27.     Defendant Allstate Indemnity Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Indemnity Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Allstate Indemnity Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

28.     Defendant Allstate Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Allstate Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

---

[5] *See* https://www.geico.com/about/corporate/corporate-ownership/ (last accessed September 11, 2015).

29.     Defendant Allstate Property and Casualty Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Property and Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Allstate Property and Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

30.     Defendant Encompass Insurance Company of America is an Illinois insurance company with its principle place of business in Northbrook, IL.  Defendant Encompass Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Encompass Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

31.     Defendants Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Insurance Company, Allstate Property and Casualty Insurance Company and Encompass Insurance Company of America are subsidiaries of Allstate Corporation.[6] Unless otherwise noted, these particular defendants are collectively referred to herein as "Allstate Defendants."

32.     Defendant United Services Automobile Association is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant United Services Automobile Association is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant United Services Automobile Association may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

---

[6] http://www.sec.gov/Archives/edgar/data/899051/000091205701008238/a2042391zex-21.htm

33.     Defendant USAA Casualty Insurance Company is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant USAA Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant USAA Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

34.     Defendant USAA General Indemnity Company is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant USAA General Indemnity Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant USAA General Indemnity Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

35.     Defendants United Services Automobile Association, USAA Casualty Insurance Company and USAA General Indemnity Company are all operating companies of USAA.[7] Unless otherwise noted, these particular defendants are collectively referred to herein as "USAA Defendants."

36.     Defendant American Family Mutual Insurance Company ("American Family") is a Wisconsin insurance company with its principle place of business in Madison, WI. American Family is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), American Family may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

37.     Defendant Liberty Mutual Insurance Company is a Massachusetts insurance company with its principle place of business in Boston, MA. Defendant Liberty Mutual Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business

---

[7] See https://www.usaa.com/inet/pages/newsroom_factsheets_main?akredirect=true

and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Liberty Mutual Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

38.     Defendant Safeco Insurance Company of America is a New Hampshire insurance company with its principle place of business in Boston, MA. Defendant Safeco Insurance Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Safeco Insurance Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

39.     Defendants Liberty Mutual Insurance Company and Safeco Insurance Company are subsidiaries of Liberty Mutual Group.[8] Unless otherwise noted, these particular defendants are collectively referred to herein as "Liberty Mutual Defendants."

40.     Defendant Hartford Casualty Insurance Company is an Indiana insurance company with its principle place of business in Hartford, CT. Defendant Hartford Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Hartford Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

41.     Defendant Hartford Insurance Company of the Midwest is an Indiana insurance company with its principle place of business in Hartford, CT. Defendant Hartford Insurance Company of the Midwest is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Hartford Insurance Company of the Midwest may be served with process through the

---

[8] *See* http://www.libertymutualgroup.com/omapps/ContentServer?pagename=LMGroup/Views/lmgDisclosure&cid=1138 366154501 and https://www.mdinsurance.state.md.us/sa/documents/SAFECO-5-9-13.pdf

Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

42.     Defendants Hartford Casualty Insurance Company and Hartford Insurance Company of the Midwest are subsidiaries of the Hartford Financial Services Group, Inc.[9]  Unless otherwise noted, these particular defendants are collectively referred to herein as "Hartford Defendants."

43.     Defendant CSAA Fire & Casualty Insurance Company is an Indiana insurance ("CSAA") company with its principle place of business in Walnut Creek, CA. CSAA is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), CSAA may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

44.     Defendant Nationwide Insurance Company of America is a Wisconsin insurance company with its principle place of business in Columbus, OH. Defendant Nationwide Insurance Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Nationwide Insurance Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

45.     Defendant Nationwide Mutual Insurance Company is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Nationwide Mutual Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Nationwide Mutual Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

---

[9] *See* http://www.sec.gov/Archives/edgar/data/874766/000095012308002003/y49953exv21w01.htm

46.     Defendant Nationwide Affinity Insurance Company of America is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Nationwide Affinity Insurance Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Nationwide Affinity Insurance Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

47.     Defendants Nationwide Insurance Company of America, Nationwide Mutual Insurance Company and Nationwide Affinity Insurance Company of America are all part of the Nationwide corporate family.[10]   Unless otherwise noted, these particular defendants are collectively referred to herein as "Nationwide Defendants."

48.     Defendant Sentry Insurance a Mutual Company ("Sentry") is a Wisconsin insurance company with its principle place of business in Stevens Point, WI. Sentry is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Sentry may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

49.     Defendant Metropolitan Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI. Defendant Metropolitan Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Metropolitan Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

---

[10] See http://www.nationwide.com/about-us/affiliated-companies.jsp

50.     Defendant Metropolitan Group Property and Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI. Defendant Metropolitan Group Property and Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Metropolitan Group Property and Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

51.     Defendant Metropolitan Property and Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI. Defendant Metropolitan Property and Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Metropolitan Property and Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

52.     Defendant Metropolitan Casualty Insurance Company, Metropolitan Group Property and Casualty Insurance Company and Metropolitan Property and Casualty Insurance Company are all subsidiaries of Metlife, Inc.[11] Unless otherwise noted, these particular defendants are collectively referred to herein as "Metlife Defendants."

53.     Defendant Infinity Insurance Company ("Infinity") is an Indiana insurance company with its principle place of business in Birmingham, AL. Infinity is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Infinity may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

---

[11] See http://www.sec.gov/Archives/edgar/data/1099219/000093783414000011/met-xexhibit211metlifesubs.htm

54.     Defendant Travelers Property Casualty Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Property Casualty Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Travelers Property Casualty Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

55.     Defendant Travelers Casualty and Surety Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Casualty and Surety Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Travelers Casualty and Surety Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

56.     Defendant Travelers Casualty Insurance Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Casualty Insurance Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Travelers Casualty Insurance Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

57.     Defendant The Travelers Indemnity Company is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant The Travelers Indemnity Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant The Travelers Indemnity Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

58.    Defendants Travelers Property Casualty Company of America, Travelers Casualty and Surety Company of America, Travelers Casualty Insurance Company of America and The Travelers Indemnity Company are subsidiaries of The Travelers Companies, Inc.[12]   Unless otherwise noted, these particular defendants are collectively referred to herein as "Travelers Defendants."

59.    Defendant Safeway Insurance Company ("Safeway") is an Illinois insurance company with its principle place of business in Westmont, IL. Safeway is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Safeway may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

60.    Defendant Country Mutual Insurance Company ("Country Mutual") is an Illinois insurance company with its principle place of business in Bloomington, IL. Country Mutual is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Country Mutual may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

61.    Defendant United Automobile Insurance Company ("UAIC") is a Florida insurance company with its principle place of business in Miami Gardens, FL. UAIC is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), UAIC may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

62.    Defendant Mercury Casualty Company ("Mercury") is a California insurance company with its principle place of business in Los Angeles, California.  Mercury is registered

---

[12]   *See*   http://sec.edgar-online.com/travelers-companies-inc/10-k-annual-report/2014/02/13/section55.aspx   (last accessed September 16, 2015).

with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona.  Pursuant to A.R.S. § 20-222(A), Mercury may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

63.     State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, American Family, Liberty Mutual Defendants, Hartford Defendants, CSAA, Nationwide Defendants, Sentry, MetLife Defendants, Infinity, Travelers Defendants, Safeway, Country Mutual, UAIC and Mercury are collectively referred to herein as "Defendant insurers."

64.     Allegations referencing "Defendant insurers" are intended to convey that each and every defendant in the above-paragraph engaged in the same conduct. "Defendant insurers" should be read in such a way that each defendant is having the allegations made about it individually.

## JURISDICTION AND VENUE

65.     Original jurisdiction and venue exists in this Court pursuant to 28 U.S.C. § 1331, as the Plaintiffs assert causes of action arising under the United States Constitution, and/or laws and treaties of the United States; and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

## FACTS

66.     Plaintiffs are or were in the business of repairing damaged motor vehicles.

67.     Plaintiffs perform or performed repairs on vehicles primarily garaged at locations throughout Arizona. Plaintiffs, being located in the Phoenix-metropolitan area, a popular tourist destination, also perform work on vehicles primarily garaged at locations outside of Arizona.

68.     Defendant insurers are insurance companies that provide automobile policies to consumers throughout Arizona.  Furthermore, Defendant insurers have made payment of claims to third-party claimants residing in and outside of Arizona.

69.     There are two types of body shops in the automobile repair industry: body shops, such as Plaintiffs' businesses, that strive to serve the owner of the car (*i.e.*, the true customer) and body shops that strive to serve the insurance company.

70.     Plaintiffs provide or provided motor vehicle repair services to vehicle owners, a significant number of which are Defendant insurers' insureds and claimants.

71.     Defendant insurers are individually responsible for paying for their respective insureds' and claimants' repairs.

72.     But Defendant insurers have engaged in a widespread, concerted and combined course of illegal conduct to depress automobile repair costs and control the automobile repair industry by, among other things: (1) price fixing labor rates; (2) price fixing replacement parts; (3) compelling use of substandard or dangerous replacement parts; (4) compelling use of parts procurement programs or parts sources; (5) boycotting Plaintiffs' businesses; and/or (6) steering customers away from Plaintiffs and similarly situated body shops for refusing to comply with fixed prices, refusing to use substandard or improper parts, or nonperformance of critical processes and procedures.

73.     Defendant insurers, through their aggregated market share and through agreement with other Defendant insurers, interfere with Plaintiffs' current and prospective business relations by, among other things: (1) intentionally misrepresenting and/or knowingly making false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses and (2) threatening insureds and/or claimants with denial of coverage (or portions of available coverage) if the insured and/or claimant persists in their efforts to patronize Plaintiffs' businesses.

74.     The purpose of Defendant insurers' illegal combination and/or utilization of aggregated market power is to eradicate competition within the automobile repair industry so as to create a system that rewards body shops for cutting corners, which ensures that Defendant insurers maximize profits, and that punishes body shops—such as Plaintiffs' businesses—that are unwilling to compromise the quality and safety of American consumers' repair to comply with Defendant insurers' demands.

75.     Antitrust laws are intended to increase competition for the benefit of American consumers.  Defendant insurers' widespread, comprehensive and uniform conduct has stripped away that benefit.  Instead of promoting a market where the best quality repairs are performed for the lowest cost, Defendant insurers have fixed the costs for their utmost benefit and forced the market into a race to the bottom in terms of quality workmanship and performance.

76.     Defendant insurers' actions violate federal and state law.

Defendant Insurers' Arizona Market Share

77.     According to the information reported to the National Association of Insurance Commissioners, as of December 31, 2012, the named Defendant insurers hold *nearly ninety percent* of the private passenger auto liability market in Arizona. *See* Exhibit 1, NAIC Property/Casualty Insurance Industry by Line Market Share, Private Passenger Auto No-Fault (PIP) + Other Private Passenger Auto Liability (Arizona).

78.     The reported market shares of the Defendants are as follows:

| | |
|---|---|
| State Farm Group[13] | 17.07% |
| Zurich Insurance Group[14] | 11.7% |
| Progressive Group[15] | 10.92% |
| Berkshire Hathaway Group[16] | 10.69% |
| Allstate Insurance Group[17] | 7.83% |
| United Services Automobile Association Group[18] | 6.74% |
| American Family Insurance Group[19] | 6.19% |
| Liberty Mutual Group[20] | 4.07% |
| Hartford Fire and Casualty Group[21] | 3.04% |
| California State Auto Group[22] | 2.07% |
| Nationwide Corporation Group[23] | 1.84% |

[13] Includes State Farm Defendants.
[14] Includes Farmers Defendants.
[15] Includes Progressive Defendants.
[16] Includes GEICO Defendants.
[17] Includes Allstate Defendants.
[18] Includes USAA Defendants.
[19] Includes Defendant American Family.
[20] Includes Liberty Mutual Defendants.
[21] Includes Hartford Defendants.
[22] Includes Defendant CSAA.
[23] Includes Nationwide Defendants.

| | |
|---|---|
| Sentry Insurance Group[24] | 1.65% |
| Metropolitan Group[25] | 1.58% |
| Infinity Property and Casualty Group[26] | 1.22% |
| Travelers Group[27] | 0.85% |
| Safeway Insurance Group[28] | 0.83% |
| County Insurance and Financial Services Group[29] | 0.80% |
| United Automobile Insurance Group[30] | 0.67% |
| Mercury General Group[31] | 0.43% |

79.     While the individual Defendant insurers' market shares seem insignificant, the Defendant insurers' market shares collectively account more than $1.75-billion in direct earned premiums in Arizona in 2013. *See* Exhibit 1.  Even Mercury's relatively small market share translates into to approximately $8.2-million in direct earned premiums. *Id.*

80.     State Farm Defendants, which hold the majority market share in Arizona (17.07% and $342,302,652.00 in direct earned premiums), play the leading role in price fixing, promoting boycotting and steering, and engaging in other illegal conduct among the Defendant insurers. Notwithstanding, the Defendant insurers' collective market share is critical, as it represents one of the primary means through which Defendant insurers exert control over the automobile repair industry within Arizona.

81.     The effect of Defendant insurers' market share has been judicially recognized.  For example, in *Allstate Ins. Co. v. Abbott*, No. 3:03-CV-2187-K, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006) (*aff'd, Allstate Inc. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007)), the court stated that "[d]ue to the prevalence of automobile insurance, and the numerous state laws requiring motorists to maintain insurance, insurance companies play a significant role in funding automobile repairs[;]" and, as a result, "have the ability and market power to exert substantial

---

[24] Includes Defendant Sentry.
[25] Includes Metropolitan Defendants.
[26] Includes Defendant Infinity.
[27] Includes Travelers Defendants.
[28] Includes Defendant Safeway.
[29] Includes Defendant Country Mutual.
[30] Includes Defendant UAIC.
[31] Includes Defendant Mercury.

influence and control over where its customer will take a wrecked car for repairs." *Id.* The court explained:

> In many cases, the insurance company is the first point of contact for a customer after a collision. Allstate's consumer surveys confirmed that "because individuals typically do not know what to do after an automobile accident or where to take the car for repair, they frequently expect to get information from their agent." Allstate's consumer surveys further state that "an agent's recommendation holds a lot of weight with customers. Many say they have built a relationship over time and trust the agent's recommendation."

*Id.*

82.    But, as recognized in *Allstate Inc. Co.*, "[t]he role of the insurance company in the repair market creates tension, because there is an inherent conflict of interest between the insurance company's desire to make a profit for its shareholders, and thus to keep its costs of repair low, with the insurance company's obligation to provide its insured with a high quality and safe repair in accordance with the terms of its applicable insurance contracts."

83.    Defendant insurers illegally exploit their cumulative market share to definitively fix prices, boycott Plaintiffs' businesses, steer current and prospective customers from Plaintiffs' businesses, and engage in other illegal conduct, all of which is further explained *infra*.

Body Shop Cost and Revenue Structure

84.    Plaintiffs' businesses can generally be broken down into the following categories of costs and revenue: (a) labor; (b) parts; (c) mechanical and electrical repair; and (d) administrative costs. In each category, there are fixed and variable costs.

A.    Labor

85.    Collision repair involves several stages, different procedures and processes; however, these can be generally broken down into the following subcategories: (1) body labor, (2) painting and (3) refinishing. These labor stages have individual labor rates.

A.1.    Body Labor

86.    Body labor is the process wherein damage to the part(s) on the body of the vehicle is/are mended or replaced.

87.    Body labor rates can vary based on the vehicle's materials.  Fiberglass composites and aluminum are more difficult to repair than steel because they requires additional, specialized equipment that, in turn, requires a particular skill set from the technician(s).  For those reasons, Plaintiffs have a higher hourly labor rate for vehicles made of fiberglass composites (*e.g.*, Corvettes) and aluminum body panels (*e.g.*, BMW 3, 5 and 6 Series, Mercury Mountaineer, Range Rover and Nissan Altima).

88.    Another aspect of body labor is frame/unibody repair.  In order to repair the frame/unibody of a vehicle, the vehicle must be stabilized on a dedicated frame machine so as to not further damage the frame/unibody and measured—typically using a laser measuring tool or other computerized optic or manual measuring tool—to determine where the frame/unibody is damaged and the extent of the damage.  The frame is then slowly pulled via hydraulic towers to reverse the damage, which is a process that must be done at a deliberate pace since a rushed frame pull may cause further damage or destroy the frame altogether.

89.    Legends' posted body labor rate is $54.00 per hour and it charges $54.00 per hour for frame labor and $165.00 per hour for exotic body labor rate.  Plaintiff Legends' posted labor rates have not changed since 2013.

90.    Jan's Spectrum's posted body labor rate is $52.00 per hour and it charges $105 per hour for frame labor.  Plaintiff Jan's Spectrum's posted labor rates have not changed since 2012.

91.    Airport Auto's posted body labor rate is $60.00 per hour and it charges $68.00 per hour for frame labor and $85.00 per hour for work on fiberglass composites and/or aluminum body parts.  Plaintiff Airport Auto's posted labor rates have not changed since 2008.

92.    Isham's posted body labor rate was $52.00 per hour from approximately 2009 to 2012, when Isham sold his ownership in New Image Paint and Body Shop, Inc.

A.2.    Refinish

93.     Refinishing involves the process of smoothing the mended or replaced body parts to prepare for painting after the body repair has been completed.  Typical refinishing processes include application of primer, sealer (a barrier coat between the bare material and paint necessary to prevent negative reaction with the paint), base coat, and, depending upon the finish of the vehicle, an additional mid-coat. Refinishing also includes the mixing of the liquid component colors to match and blend with the undamaged paint on the vehicle.

94.     Refinishing labor rates are usually equal to or slightly less than body labor rates.

95.     Plaintiff Legends' posted refinishing labor rate is $54.00 per hour.  Plaintiff Legends' posted labor rates have not changed since 2013.

96.     Plaintiff Jan's Spectrum's posted refinishing labor rate is $52.00 per hour.  Plaintiff Jan's Spectrum's posted labor rates have not changed since 2012.

97.     Plaintiff Airport Auto's posted refinishing labor rate is $60.00 per hour.  Plaintiff Airport Auto's posted labor rates have not changed since 2008.

A.3.    Paint and Materials

98.     Paint application for automotive vehicles is not a one-step process.

99.     Paint preparation requires washing the vehicle and taping off undamaged portions to prevent over-spray on tires and wheel wells.

100.    Paint is usually applied in a paint booth—a self-contained and controlled environment—separate from the other repair areas of a body shop.  Paint booths have a clean air intake system that reduces contamination and an outgoing filtering system that reduces atmospheric contamination.[32]

101.    Once painting is completed, a clear coat is applied and the vehicle is left to dry.

102.    The repair, refinish, and paint process is generally not linear.  Depending on the nature of the repair made and its location on a vehicle, a repair may require several refinish and paint procedures (and could require further repair procedures) before completion. For example,

---

[32] Body shops, including Plaintiffs, are required to comply with the Environmental Protection Agency's regulations relating to hazardous material emissions and disposal requirements.

when replacing a bumper, the entire part needs to be sanded and primed, the inside of the bumper needs to be painted to match the vehicle before it is bolted onto the vehicle, and finally the vehicle is returned to the refinish and paint process.

103.    Additionally, to avoid clashing paint at the point where the repaired or replaced portion meets the undamaged portion of the vehicle, the undamaged portion must be sanded and the paint must be blended into the existing color to create a seamless transition between original paint and new paint.

104.    It is impossible, even in the controlled environment of a paint booth, to completely remove all dust and contaminants from a vehicle that has been on the open roads.  During the paint process, the air pressure causes some amount of dust and small contaminants to become airborne and settle in the paint. When the paint dries, these contaminants cause an uneven surface in the paint and an additional refinish process must be completed to smooth out the imperfections.  While there is some regional variation in the name, this process is generally termed denibbing or finessing.  Without this process, the finished product would not return the vehicle to its pre-loss condition.

105.    Paint labor rates traditionally include material costs, calculated as a percentage of refinish labor hours for a given repair and expressed as an hourly rate based upon a standard repair. But that method does not compensate the body shop for the actual costs of labor and materials in many cases and it results in the body shop working at a loss.

106.    Some vehicles have unique colors that require both special-order paints and mixing to blend into the undamaged portion of the vehicle.

107.    Because the traditional method of calculating materials costs has not kept pace with the actual cost of completing repairs, many shops—including Airport Auto and Jan's Spectrum— use paint and materials calculators ("PMCs").  PMCs are software programs that calculate the cost of the paint and materials actually used in the particular repair.  Actual costs are pre-programmed to account for the costs of specific materials (*e.g.*, Sikkens brand of paint versus Axalta brand of paint).  Once the details of the repair are entered into the PMC, it generates the amount and cost

of the materials used. The PMC also produces an invoice that is incorporated into the final bill along with the paint labor costs.

B.    Parts

108.    Vehicle parts constitute a significant portion of Plaintiffs' and other body shops' expenses.  Generally, there are three categories of parts: original equipment manufacturer parts ("OEM parts"), which are new parts from the vehicle manufacturer that are specifically designed for the vehicle; aftermarket parts, which are new parts that are manufactured by a company other than the original vehicle manufacturer; and salvage parts, which are parts sourced from previously wrecked vehicles.

109.    Aftermarket parts are commonly referred to as "imitation" or "counterfeit" parts.

110.    Salvage parts are commonly referred to as "recycled" or "reconditioned" parts.

111.    Professional repairers, including Plaintiffs, customarily recommend OEM parts because they are subject to federal safety requirements[33] and they ensure a higher quality fit and finish since the parts are made based on the original manufacturer's design specification.  For the same reasons, Plaintiffs customers, including Defendant insurers' insureds and claimants, prefer and often request OEM parts.

112.    Conversely, there are no federal safety requirements for aftermarket crash parts and they are commonly made of thinner materials or multiple pieces spot-welded together, which also negatively affects a vehicle's crash-safety performance.

113.    The California Department of Consumer Affairs, Bureau of Automotive repair found that four of five non-OEM crash parts tested were inferior to OEM parts. *See* Exhibit 2 [Excerpts from California Bureau of Automotive Repair *Reporter*, Summer/Fall 2003]

114.    Ford Motor Company tested performance of OEM crash parts and aftermarket crash parts and found that aftermarket parts failed to perform at the same level as OEM parts.[34]  Further, it found that repair costs for vehicles with aftermarket parts that were subject to a collision were

---

[33]    *See, e.g.,*   http://www.gpo.gov/fdsys/pkg/GAOREPORTS-FILE-d01225/pdf/GAOREPORTS-FILE-d01225.pdf (last accessed on September 11, 2015).
[34]    *See* https://www.youtube.com/watch?v=LPly9QFteso (last accessed September 16, 2015).

almost twice as expensive to repair when compared to vehicles with OEM parts that were subject to the same collision.[35]

115.    Consumer Reports, like Ford Motor Company, found that aftermarket parts failed to perform at the same level as OEM parts.[36]

116.    For instance, the bumper plays a critical role in deployment of a vehicle's airbags. During a front-end crash, a series of vibrations through the bumper alerts the airbag sensors how fast to deploy, if at all. Aftermarket bumpers—often made with different, thinner, and cheaper materials—do not vibrate in the same manner as OEM bumpers, which can result in failure of the airbag system.

117.    Vehicle hoods are also designed to fail in a manner that absorb and distribute the impact energy to protect the vehicle's passengers. Aftermarket hoods—often made of thinner and cheaper materials—do not fail like OEM hoods fail, which endangers the vehicle's passengers.

118.    Aftermarket windshield glass also poses a serious safety risk to vehicle occupants. For example, the vehicle's windshield functions to stop the vehicle's roof from collapsing during a rollover crash but, since it is not subject to the same crash testing requirements and does not have the same design specifications as OEM windshield glass, aftermarket windshield glass has a higher tendency of shattering or simply popping-out altogether.

119.    Aftermarket and salvage parts are, almost always, less expensive compared to OEM parts and there are no guarantees that aftermarket parts will perform to OEM part standards. Aftermarket parts must frequently be modified to fit the intended vehicle, which requires additional labor.  The additional labor typically makes the use of aftermarket parts more expensive than OEM parts.

120.    Body shops, including Plaintiffs, order parts from vendors as needed.

121.    State Farm Defendants require its direct repair facility body shops to use Parts Trader, which is a subscription online vendor marketplace.  Through Parts Trader, a subscriber

---

[35] *Id.*

[36] *See, e.g.,* http://www.consumerreports.org/cro/news/2010/08/video-knock-off-bumper-part-explodes-in-crash-test/index.htm (last accessed September 16, 2015).

inputs the required part and vendors respond with availability and prices. In theory, a DRP body shop would be permitted to select the proper part at a competitive price or purchase the part elsewhere, if a quality part is not available.

122. Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, Liberty Mutual Defendants, Hartford Defendants, Nationwide Defendants, Metlife Defendants, and Travelers Defendants similarly require their respective direct repair facilities to follow direction on parts sourcing and do not permit their individual direct repair facilities to select parts or shop elsewhere if a quality part is unavailable.

123. State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, Liberty Mutual Defendants, Hartford Defendants, Nationwide Defendants, Metlife Defendants, and Travelers Defendants routinely and uniformly source the least expensive parts available for their respective direct repair facilities even when the parts originate from questionable or unknown source, are not of like kind or quality, or are known to be poorly manufactured.

124. State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, Liberty Mutual Defendants, Hartford Defendants, Nationwide Defendants, Safeway, and UAIC have carried this practice over to non-DRP shops, including Plaintiff Airport Auto. State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, Liberty Mutual Defendants, Hartford Defendants, Nationwide Defendants, Safeway, and UAIC have refuse to pay Plaintiff Airport Auto for the difference between the non-Parts Trader sourced part and the Parts Traders sourced part *regardless* of availability, quality or fit.

125. Defendant insurers compel or attempt to compel Plaintiffs to use insurer-sourced parts, which are invariably the least expensive, even when the part originates from questionable or unknown source, is not of like kind or quality, or is known to be poorly manufactured.

126. State Farm Defendants' benefits extend beyond the suppression of prices for parts. State Farm funded the development of the Parts Trader program and contracted with the company

for repayment of its investment.  In addition, State Farm remains a primary investor in Parts Trader and receives a kick-back from Parts Trader profits.

127.    Defendant insurers routinely deny Plaintiffs requests to use OEM parts, require the use of aftermarket parts before authorizing the repair, and/or refuse to pay for the additional labor that is required to prefit or modify aftermarket parts.

128.    Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, American Family, Nationwide Defendants, Hartford Defendants, Liberty Mutual Defendants, Safeway and UAIC all refuse to reimburse Plaintiff Airport Auto for labor hours required to prefit or modify insurer-specified aftermarket parts.  The consequence forces Airport Auto into using more expensive, but proper fitting and performing, parts (typically, OEM parts) because the additional uncompensated labor hours make the insurer-specified aftermarket part more expensive than ordering an unapproved OEM part to complete the repair in the first instance. But State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, American Family, Nationwide Defendants, Liberty Mutual Defendants, Hartford, Safeway and UAIC also routinely refuse to reimburse Airport Auto for the more expensive, but proper fitting, parts.

129.    All Defendant insurers have refused to reimburse Legends for labor hours required to prefit insurer-specified aftermarket parts.  The consequence forces Legends into using more expensive, but proper fitting and performing, parts (typically, OEM parts) because the additional uncompensated labor hours make the insurer-specified aftermarket part more expensive than ordering an unapproved OEM part to complete the repair in the first instance.  But Defendant insurers refuse to reimburse Legends for the more expensive, but proper fitting, parts.

130.    Defendant insurers' insistence on using aftermarket or salvaged parts reduces payment of claims at Plaintiffs' expense and insureds'/claimants' safety.

C.    Mechanical

131.    Vehicle collision repair often involves repairing damage to mechanical parts, such as the vehicle engine.

132.     Plaintiffs have or had mechanical repair specialists on-site.  When mechanical work is/was required to repair a damaged vehicle, a separate hourly rate is/was charged.

133.     Plaintiff Legends' posted mechanical labor rate is $135.00 per hour.  Legends' posted mechanical labor rates have not changed since 2013.

134.     On occasion, Legends out-sources mechanical work to dealerships or specialists. When out-sourcing, Legends incorporates a twenty-five percent (25%) mark-up on the mechanical work, which is intended to cover transportation of the vehicle, employee overhead, coordination with the third-party mechanical repairer and the insurance company (if applicable).

135.     Defendants State Farm, Farmers, American Family regularly refuse to fully-reimburse Legends for the twenty-five percent mark-up for out-sourcing mechanical work.

136.     Plaintiff Jan's Spectrum's posted mechanical labor rate is $125.00 per hour.  Jan's Spectrum's posted mechanical labor rates have not changed since 2012.

137.     Plaintiff Airport Auto's posted mechanical labor rate is $115.00 per hour.  Airport Auto's mechanical labor rates have not changed since 2008.

138.     Plaintiff Isham's posted mechanical labor rate was $95 per hour from approximately 2009 to 2012 when Isham sold his ownership in New Image Paint and Body Shop, Inc.

139.     State Farm Defendants and GEICO Defendants routinely refuse to or threaten to refuse paying Plaintiffs' posted mechanical rates unless Plaintiffs reduce their mechanical labor rates.

     d.     <u>Administrative Costs</u>

140.     Administrative costs are fees assessed for necessary non-repair work.

141.     Some body shops, such as Plaintiffs Legends and Airport Auto, charge a flat fee for administrative tasks; while others, such as Plaintiffs Jan's Spectrum, charge a fixed rate for administrative tasks.

142.    Defendant insurers routinely refuse to pay for administrative costs yet compel performance of the tasks by illegally threatening to withhold payment for completed repair procedures.

143.    For example, each Defendant insurer requires numerous photographs to be taken and transmitted electronically before authorizing work on the damaged vehicle.  It is commonplace for Defendant insurers to refuse payment for a repair performed or part utilized unless a photograph is provided.

144.    Defendant State Farm demands photographs of the denib and finesse procedure for every repair and refuses to pay for the procedure until the photographs are provided.  State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, Liberty Mutual Defendants, Nationwide Defendants, Safeway and UAIC regularly refuse to pay Plaintiffs Airport Auto and Legends for this refinishing process but, on the rare occasion it is approved, payment is contingent upon Airport Auto's and Legends' compliance with the administrative tasks.

145.    State Farm Defendants, Farmers Defendants, Allstate Defendants, and Liberty Mutual Defendants frequently demand photographs from Plaintiffs Airport Auto and Legends for repairs at various stages and refuses to pay for repairs until the photographs are provided.

146.    Receiving and inspecting vehicle repair parts constitutes another administrative cost.  The aftermarket and salvage parts that Defendant insurers mandate are often inappropriate, broken or of poor quality, and must be repackaged, returned to the sender, and new parts need to be ordered. These tasks utilize employee time and resources and demand expenditure of funds that would not be necessary but for Defendant insurers' stipulations.

147.    For example, Metlife has refused to pay Plaintiff Legends for administrative costs associated with aftermarket parts that needed to be reordered because they were broken before or during delivery despite requiring their use in the first-place.

148.    As previously mentioned, Defendant insurers compel or attempt to compel Plaintiffs to use insurer-specified and -sourced parts.  Insurer-specified parts are often sourced

from out-of-state suppliers.  On occasion, but only after being presented with issues relating to payment for returning damaged parts and quotes from the out-of-state suppliers that include freight, Defendant insurers ultimately concede and authorize reimbursement for Plaintiffs' use of locally-sourced parts.  That said, Defendant insurers routinely refuse to reimburse Plaintiffs for the labor and costs associated with the administrative tasks of researching and presenting such information to Defendant insures.

149.    As further discussed below, Defendant insurers routinely write estimates specifying the use of aftermarket and salvaged parts when using such parts would void the vehicle manufacturer's warranty, contradict the express direction of the vehicle owner, and/or contradict the vehicle manufacturer's recommendation.  On occasion, but only after being presented with authority demonstrating that the insurer-specified parts are unfit for use, Defendant insurers ultimately concede and authorize reimbursement for Plaintiffs' use of appropriate parts.  That said, Defendant insurers routinely refuse to reimburse Plaintiffs for the labor and costs associated with the administrative tasks of researching and presenting such information to Defendant insures.

Role of Direct Repair Programs

150.    Direct repair programs ("DRPs") were initially established as a direct relationship between the insurer and body shops, through which the insurer recommended body shops to its insureds and claimants.

151.    Many insurers have developed their own brand of DRPs, including State Farm Defendants, GEICO Defendants, Allstate Defendants, Progressive Defendants, Farmers Defendants, Liberty Mutual Defendants, Nationwide Defendants, Hartford Defendants, Metropolitan Defendants, USAA Defendants, and Travelers Defendants (collectively referred to herein as "DRP Defendant insurers").

152.    DRPs are presented to body shops as a mutually beneficial opportunity: in exchange for providing reduced pricing under a "most favored nation" clause and preferential timing of repairs, the insurer would list the body shop as a recommended repair facility and, as a result, the body shop would receive a higher volume of customers.  That said, the DRP Defendant insurers

never actually agreed to confer a benefit upon any shop and DRP Defendant insurers do not treat DRPs as enforceable contracts.

153.    DRP Defendant insurers tout their DRPs as beneficial, time- and cost-saving programs.

154.    The reality, however, is that DRP Defendant insurers' DRPs emphasized the conflict of interest between DRP Defendant insurers' desire to keep repair costs low, and thus to make a profit for their shareholders, with the DRP Defendant insurers' obligation to provide their insured and/or claimant with a high quality and safe repair in accordance with the terms of the applicable insurance contract.

155.    Over the course of years, the simple "volume promise in exchange for discount" DRPs have been manipulated into a portal through which Defendant insurers control and direct the entire auto body collision repair industry.  In particular, Defendant insurers uniformly exploit DRP Defendant insurers' DRP arrangements to, *inter alia*, (1) steer insureds and claimants away from non-DRP body shops, including Plaintiffs' body shops, and towards captive and/or DRP body shops; (2) suppress labor rates; (3) direct auto body repair procedures; and (4) control pricing of replacement parts.

156.    Defendant insurers require DRP body shops to accept lower prices for labor, paint, materials and parts, and refuse to pay (or only partially pay) for certain repair processes and procedures.  Additionally, DRP Defendants insurers compel the DRP shops to include them as an additional insured on the shop's liability insurance (even though it does not hold a lien or other ownership interest), compel indemnification for liability assessed to the DRP Defendant insurer, compel primary assumption of liability for repairs using parts that the DRP Defendant insurer insists on using, compel mandatory production of the DRP shop's financial information, and demand authority to perform background checks on the DRP shop's employees.

157.    DRP Defendant insurers consistently disregard the terms of DRP arrangements when it is in the Defendant insurers' best financial interest, regardless of the impact on the insured/claimant and DRP body shop.  For example, State Farm Defendants' routinely ignores the

language in their Select Service DRP, which requires the use of certified parts for crash-related parts (*e.g.*, bumper assembly and radiator supports), and includes salvaged crash-related parts that come from unknown sources and without any indicia of crashworthiness, in their estimates. Further, State Farm Defendants routinely refuse payment for the repair unless the salvaged crash-related parts are used or refuse to pay for a more expensive part if the body shop does not follow State Farm Defendants' direction and orders a better-suited, safer crash-related part.

158. Recently, State Farm Defendants unilaterally modified their Select Service DRP to include a clause that permits State Farm Defendants to disregard any term it chooses without consequence to State Farm Defendants. This includes the use of certified crash-related parts. Additionally, the modified Select Services DRP arrangement requires shops to relinquish all legal rights and recourse against State Farm Defendants for all claims related to parts that State Farm Defendants select for use and requires DRP shops to assume all liability for repairs, including liability resulting from use of State Farm-mandated parts.

159. If a DRP shop fails to comply with a DRP Defendant insurers' demands (*e.g.*, fails to disclose financial information), the Defendant insurer threatens the DRP shop's pecuniary health to compel performance.

160. Failure to comply with the DRP arrangement results in the DRP Defendant insurer both removing the noncompliant DRP shop from its DRP and steering customers away from the DRP shop, or the DRP Defendant insurer reducing the volume of customers that the Defendant insurers send to the DRP shop, increasing refusals to pay for repair procedures and/or invalid or unreasonable charges.

161. For example, Airport Auto formerly associated with USAA Defendants' DRP. Airport Auto received a warning from USAA Defendants' representative that Airport Auto was not using enough aftermarket parts compared to Airport Auto's competitor. Despite the warning, Airport Auto refused to use imitation parts on vehicles. Thereafter, Airport Auto's volume of vehicles that USAA Defendants' insured dropped. Airport Auto ultimately disassociated with USAA Defendants' DRP because the reduction in volume and increase in costs associated with

maintaining the DRP status with USAA Defendants (*e.g.*, USAA Defendants required Airport Auto to list USAA Defendants on its liability insurance, which increased Airport Auto's insurance premiums) led to a financially unsustainable situation.   After disassociating from USAA Defendants' DRP, Airport Auto's volume of vehicles that USAA Defendants' insured was reduced even further.

162.    Airport Auto also formerly associated with State Farm Defendants' DRP.   State Farm Defendants, through its DRP arrangement, required Airport Auto to use a certain salvaged part for a repair.   Believing that the specified salvaged part was unfit for use—due principally to concerns of safety and crashworthiness—Airport Auto refused to complete the repair with the specified salvaged part.   Shortly after that event, Airport Auto's DRP status with State Farm Defendants was dissolved.   After disengaging as a DRP for State Farm Defendant, Airport Auto's volume of vehicles that State Farm Defendant' insured dropped.

163.    Jan's Spectrum is a current DRP shop for Farmers Defendants and has been for over twenty-years.   Jan's Spectrum had a customer that was insured through Farmers Defendants. Among other things, the customer's vehicle's composite wheels were damaged and, in Jan's Spectrum's professional opinion, need to be replaced.   Farmers Defendants' agent disagreed.   As a result of failing to comply with Farmers Defendants' direction, Farmers Defendants stripped Jan's Spectrum from being able to begin repairs on Farmer Defendants' covered vehicles estimated at requiring under $4,500 worth of repairs until Farmer Defendants' agent authorized the repair.

164.    These consequences for failing to comply with the Defendant insurers' demands, whether implied or not, result in tremendous concessions from the DRP shops, including, *inter alia*, the performance of repair procedures without compensation, reduction in labor rates, disclosure of financial information, reduction in quality of repair work to save costs, and use of parts that are not crashworthy or that have not been subject to a safety testing protocol.

165.    Often, DRP shops reach a point where they can no longer comply with the Defendant insurers' demands *and* operate profitably, so they disengage from the Defendant

insurers' DRP. Such was the fate of Plaintiff Airport Auto, which left State Farm Defendants' DRP in 2005 and USAA Defendants' DRP in 2007.

166. As previously stated when Airport Auto left USAA Defendants' DRP in 2007, Airport Auto's volume of vehicles that USAA Defendants' insured was reduced.

167. When Airport Auto left State Farm Defendants' DRP in 2005, Airport Auto's volume of vehicles that State Farm Defendant' insured was reduced.

168. Since 2007, Plaintiff Airport Auto has never associated with a Defendant insurers' DRP.

169. Plaintiff Legends has never associated with a Defendant insurers' DRP.

170. For approximately the last ten-years, Plaintiff Jan's Spectrum has only associated with Farmers Defendants' DRP.

171. For approximately the last ten-years, Plaintiff Isham has never associated with a Defendant insurers' DRP.

172. In the same way Defendant insurers control DRP shops, Defendant insurers collectively, through their combined market share and through agreement with other Defendant insurers, illegally compel(led) or attempt(ed) to compel non-DRP shops, including Plaintiffs Legends, Airport Auto, Jan's Spectrum and Isham, to: perform repair procedures without compensation; reduce labor rates; disclose financial information against competitive interest; reduce the quality of repair work to save costs; and use parts that are not crashworthy or that have not been subject to a safety testing protocol.

173. The terms "market" and "prevailing" rates are intended to describe a statistical average of rates in a particular industry as they ebb and flow over both time and geography, react to market influences, innovations and advances in the field, and competition between practitioners of that trade or profession.

174. Notwithstanding, with regard to labor rates, Defendant insurers exploit "most favored nation" clauses found in DRP Defendant insurers' DRP arrangements to artificially suppressed labor rates from DRPs to establish an unsubstantiated and statistically insignificant

market rate.  Defendant insurers then use self-proclaimed market rates to refuse or threaten to refuse payment for entire repair procedures unless Plaintiffs and other non-DRP shops adjust their labor rates.

175.     With regard to parts pricing, Defendant insurers refuse to pay Plaintiffs more than the lowest price of the part if it was sourced through Parts Trader (or other subscriber-only parts inventories), or the Defendant insurers source the part without Plaintiffs' input.  But Defendant insurers' parts pricing methods fails to account for elementary factors such as availability and suitability (*i.e.*, safety testing of the part and whether the part is of like-kind and quality).

176.     Furthermore, Defendant insurers unambiguously advise their respective insureds and claimants in writing that they do not assume liability for parts that the Defendant insurer sources, repair procedures that the Defendant insurer proscribes, or product defects.

Control of the Repair Process

177.     Arizona law mandates that motorists maintain insurance. The result is that insurance companies play a significant role in funding automobile collision repairs.

178.     As previously stated, Defendant insurers control approximately 90% of Arizona's market share.  Consequently, refusing to perform vehicle repairs for Defendant insurers' insureds and claimants would only leave approximately 10% of the population as potential customers within the state.  To stay in business, Plaintiffs must accept customers that Defendants insurers insure.

179.     But because Defendant insurers have successfully exploited their combined market share and illegally combine with other Defendant insurers to eradicate competition, directives from Defendant insurers are presented on a take-it-or-leave-it basis and body shops are not given an opportunity to negotiate.

180.     Further, when body shops have attempted to negotiate with Defendant insurers, Defendant insurers have responded with threats of pecuniary harm, retaliation, boycotting and/ coercion, specific examples of which will be detailed below and further revealed during discovery.

181.     Defendant insurers have all refused to negotiate with Legends regarding reimbursement on mandatory labor hours and/or processes and procedures expended on repairs.

34

For example, Encompass's employee responded to Legends when it attempted to negotiate: "[Encompass] hold[s] the check, so [Encompass] hold[s] the power."

182.    State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendant, American Family, Hartford Defendants, Liberty Mutual Defendants, Safeway and UAIC have all refused to negotiate with Airport Auto regarding reimbursement on mandatory labor hours and/or processes and procedures expended on repairs.

183.    State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendant, American Family, Liberty Mutual Defendants, Nationwide, Travelers, Safeway, UAIC have all refused to negotiate with Jan's Spectrum when negotiating payment for reimbursement on mandatory labor hours and/or processes and procedures expended on repairs.

184.    Importantly, Defendant insurers' illegal conduct is directed without consideration of a body shops' DRP status.

185.    Defendant insurers have illegally integrated themselves into every step of the automobile collision repair process despite the fact that their industry is selling and servicing insurance contracts.

186.    Plaintiffs enter into repair agreements with Defendant insurers' insured and claimants, not with Defendant insurers.  Nevertheless, every Defendant insurer has threatened to refuse payment for necessary repairs unless Plaintiffs wait for the respective Defendant insurers' agent to inspect the damaged vehicle before beginning the repair procedure.

187.    Defendant insurers' estimates expressly state that the written estimate does not authorize the body shop to begin repairs; however, insured or claimants hold that authority, not the Defendant insurers.

188.    When Plaintiffs find hidden damage during the repair process, every Defendant insurer has threatened to refuse payment for the necessary repair unless Plaintiffs either (1) take pictures of the newly discovered damage and wait for approval to continue the repair from the

35

Defendant insurer or (2) wait for an agent to re-inspect the vehicle and for approval from the Defendant insurer.  These threats are made despite the fact that Defendant insurers' know that only their insureds and claimants are empowered to authorize the repair procedure.

189.    Similarly, only Defendant insurers' insureds and claimants, and not Defendant insurers, are authorized to direct the type of part (OEM, aftermarket or salvage) for the repair. Notwithstanding, Defendant insurers write estimates specifying the use of aftermarket and salvaged parts when using such parts would void the vehicle manufacturer's warranty, contradict the express direction of the vehicle owner, and/or contradict the vehicle manufacturer's recommendation.  Defendant insurers compel body shops' compliance with the written requests through, *inter alia*, threats of refusing payment for the entire repair procedure and steering the customer (and future customers) to another repair facility.

190.    Defendant insurers routinely specify Airport Auto to use aftermarket and salvaged parts when using such parts would void the vehicle manufacturer's warranty, contradict the express direction of the vehicle owner, and/or contradict the vehicle manufacturer's recommendation.

191.    Defendant insurers repeatedly misinform consumers that aftermarket and salvage parts do not affect a vehicle's warranty.  This falsehood is repeated in writing, not only by omission[37] but affirmatively, notably by the Insurance Information Institute ("III") which has published, "Generic crash parts do not interfere with a vehicle's existing warranty and are often manufactured by the same supplier and in the same manner as OEM parts."

192.    State Farm Defendants, Farmers Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, Liberty Mutual Defendants, Hartford Defendants, Metlife Defendants, Nationwide Defendants, and Travelers Defendants are all member companies of III.[38]

193.    Additionally, III's board of directors is made up of insurance company executives. Current and former members of the board of directors include executives of State Farm Defendants, Allstate Defendants, Farmers Defendants, GEICO Defendants, Hartford Defendants,

---

[37] *See, e.g.,* USAA's Quality Replacement Parts Program brochure excerpt of FAQs, attached hereto as Exhibit 6. (USAA brochure failing to advise consumers of the limitations to their manufacturer warranty).
[38] http://www.iii.org/services/directory/company-categories/insurance-companies-iii-members

Liberty Mutual Defendants, Nationwide Defendants, Travelers Defendants, USAA Defendants, and American Family.

194.     As previously stated, Defendant insurers also compel (or attempt to compel) Plaintiffs into sourcing parts from particular vendors.  If Plaintiffs fail to procure the part(s) from Defendant insurers' choice vendor, even when compliance is impossible (*i.e.*, the specified vendor does not have the part in-stock), Defendant insurers refuse to pay for the difference between the non-insurer-sourced part and the insurer-sourced part that is actually used in the repair procedure.

195.     Defendant insurers demand that Plaintiffs follow Defendant insurers' agents' repair process and procedure recommendations even when the recommendations remove processes and procedures that are contrary to Plaintiffs' collision repair professionals' recommendations.  Again, if Plaintiffs fail to conform to Defendant insurers' demands, Defendants refuse to pay for the processes and/or procedures that are performed in addition to their agents' recommendation.

196.     Additional details of Defendant insurers conduct designed to control the repair process are discussed *infra* and will be further revealed during discovery

Price Fixing

A.     <u>Labor Rates</u>

197.     Every Defendant insurer refuses to pay Plaintiffs' posted labor rate.

198.     Every Defendant insurer contends that they will only pay the market labor rate for the market area.

199.     None of the Defendant insurers conduct a statistically significant or otherwise scientifically substantiated assessment of the market labor rates.

200.     The following Defendants have never conducted a market labor rates survey: Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, American Family, Liberty Mutual Defendants, Hartford Defendants, CSAA, Nationwide Defendants, Sentry, MetLife Defendants, Infinity, Travelers Defendants, Safeway, Country Mutual, UAIC, and Mercury.

201.    State Farm Defendants purport to have determined market labor rates for the Arizona market; however, the method used to determine the market labor rate is scientifically flawed and represents a gross-manipulation of data in order to suppress labor rates in Defendant insurers' favor.  Indeed, a State Farm employee admitted that State Farm Defendants set the rates for the entire industry, "dictate[] the market," "control[] the market," and the other auto insurers, including Defendant insurers, follow State Farm Defendants' lead.

202.    State Farm Defendants requests that body shops enter rates for body labor, refinish labor, paint, etcetera, through their proprietary internet gateways, State Farm Business to Business Portal ("B2B"), and mandates that its DRP shops enter the requested financial information.

203.    But State Farm Defendants do not simply collect the information and subject it to a statistical analysis.  Instead, upon receiving rate information that they unilaterally determine to be too high, State Farm Defendants contact the individual body shop and command (through threats to the body shop's pecuniary harm, retaliation, boycotting and coercion) the shop to lower its rates or they unilaterally alter the shop's rate information without consent.

204.    State Farm Defendants' conduct is typically targeted at larger body shops or independent shops with multiple locations.

205.    Once the rate information is altered to State Farm Defendants' satisfaction, State Farm Defendants self-defines the location of the market and lists the shops for that market from the most expensive hourly rate to least expensive hourly rate.

206.    Next, State Farm Defendants list the number of technicians a shop employs or the number of bays available, whichever is less, and totals those numbers.  State Farm Defendants then divide the totaled number by two and adds one, *e.g.*, if the total number of technicians or work bays for State Farm Defendants' self-selected area equaled fifty, State Farm Defendants' half-plus-one number would be twenty-six.

207.    Finally, starting with the least expensive shops on the list, State Farm Defendants move up the list until it reaches the half-plus-one number of technicians/work bays.  The hourly rates for whichever shop this procedure falls upon is declared the "market" or "going" rate.

208.     Even putting aside the fact that State Farm Defendants manipulate the rates at the beginning of the process, State Farm Defendants' methodology is scientifically unsupported and the end result is statistically irrelevant.

209.     State Farm Defendants' method contains a built-in bias towards the rates of larger shops or shops with more than one location, such as multi-shop operators ("MSOs" or "chains") (*e.g.*, Service King, ABRA, Sterling and Caliber), because those facilities have a higher number of work bays and technicians.  Since the number of technicians or work bays is critical to State Farm's market rate calculation, State Farm Defendants' ensure—through the previously mentioned illegal means—that the larger shops' rates conform to State Farm Defendants' predetermined outcome.

210.     State Farm Defendants' method fails to account for the quality of work performed, personnel and equipment.  State Farm Defendants' method does not provide a range of market rates; therefore, a body shop that produces the worst quality product is paid exactly the same as the body shop that produces the best quality product.

211.     State Farm Defendants do not disclose the geographic boundaries for market areas that it uses in determining the market rate.  But State Farm Defendants alter the market areas to further manipulate the market rate survey results.

212.     State Farm Defendants' market rate survey results are not disclosed or otherwise publically available.  State Farm Defendant have undergone significant efforts to keep the market rate survey results confidential.  For example, State Farm Defendants do not disclose the criteria for determining or changing the market area to its claims team leaders.  And, in litigation, State Farm Defendants habitually seek (and commonly obtain) protective orders for all information produced during discovery on the grounds that training manuals, policies and procedures, and internal processes constitute trade secrets, proprietary information or confidential information.[39]

---

[39] *See, e.g., Hover v. State Farm Mut. Auto. Ins. Co.*, 2014 U.S. Dist. LEXIS 119162 (E.D. Wa. 2014), *Akins v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 82806 (E.D. Mich. 2011), *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003), *Hamilton v. State Farm Mut. Auto. Ins. Co.*, 204 F.R.D. 420 (S.D. Ind. 2001).

213.     Despite the fact that State Farm Defendants go through elaborate efforts to keep the market rate survey results a secret and none of the other Defendant insurers perform market rates surveys, every Defendant insurer refuses to pay more than what State Farm designates as the market rate.

214.     And, importantly, Defendant insurers' price fixing of labor rates is not limited to Arizona; rather, it occurs on a national scale.  For example, in Pennsylvania, a representative of Progressive Defendants explained that body shops do not "affect pricing;" rather, the insurance companies get together to determine rates and that new rates would likely be determined at a "big meeting" that was scheduled in April 2015.

215.     In Oklahoma, a representative of USAA Defendants told a body shop that USAA's rates would likely be increasing soon because the new State Farm survey result had just been circulated.  Similarly, an Allstate Defendant representative in Georgia has stated that rates were contingent upon State Farm.

216.     One of State Farm Defendants' agents admitted that State Farm Defendants deliberately suppress labor rates so that the "prevailing competitive price" is "whatever State Farm wants it to be."  The agent further admitted that State Farm Defendants purposefully rely on out-of-date financial information, including labor rates that are "about twenty years old," for the market rate survey.

217.     The same agent stated that the allegations in the Louisiana Attorney General's action against State Farm, *State of Louisiana, ex rel. Caldwell v. State Farm*, No. 6:14-cv-6017 (currently pending before this Court), are true. Specifically, the agent stated that "we all do that," "every iota is the truth . . . when you read [the complaint], it's like, 'that's us.'"

218.     The allegations set forth in *Louisiana v. State Farm* are essentially identical to the allegations set forth in this action.

219.     Plaintiffs Legends', Jan's Spectrum's, Airport Auto's and Isham's posted labor rates are/were, respectively, $54.00, $52.00, $60.00, and $52.00 per hour for body and refinish labor.  Plaintiffs Legends, Jan's Spectrum and Airport Auto did not submit financial information

to State Farm Defendants for purposes of conducting a market rate survey.  But, in 2008 State Farm Defendants determined that the market rate for Plaintiffs was $48.00 per hour and State Farm Defendants have refused to pay more ever since.

220.    Defendant insurers have illegally combined with other Defendant insurers to exploit their aggregated market share to refuse to pay Plaintiffs more than $48.00 per hour.  Again, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, American Family, Liberty Mutual Defendants, Hartford Defendants, CSAA, Nationwide Defendants, Sentry, MetLife Defendants, Infinity, Travelers Defendants, Safeway, Country Mutual, UAIC and Mercury do not perform market rate surveys.

221.    Defendant insures have never contacted Plaintiffs to request posted rate information and Plaintiffs have never submitted posted rate information to Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, American Family, Liberty Mutual Defendants, Hartford Defendants, CSAA, Nationwide Defendants, Sentry, MetLife Defendants, Infinity, Travelers Defendants, Safeway, Country Mutual, UAIC and Mercury for purposes of performing a market rate survey.

222.    In refusing to pay more than State Farm Defendants were paying for body and refinishing labor and paint and materials, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, American Family, Liberty Mutual Defendants, Hartford Defendants, CSAA, Nationwide Defendants, Sentry, MetLife Defendants, Infinity, Travelers Defendants, Safeway, Country Mutual, UAIC and Mercury all assert both that the market rate in the market area was identical and that it was identically less than the publically posted rates.  Such assertions were based on data that could only have been acquired from or provided by State Farm Defendants.

223.    In addition, Defendants insurers receive foreknowledge of State Farm Defendants' *unpublished* market rates and conform behavior based on that foreknowledge.  For example, when State Farm Defendants decided to raise the *unpublished* market rate from $45.00 per hour to $48.00 per hour in 2008, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate

41

Defendants, USAA Defendants, American Family, Liberty Mutual Defendants, Hartford Defendants, CSAA, Nationwide Defendants, Sentry, MetLife Defendants, Infinity, Travelers Defendants, Safeway, Country Mutual, UAIC and Mercury raised their market rates to $48.00 per hour shortly thereafter.

224.    State Farm Defendants have not since raise the unpublished market rate from $48.00 per hour and every Defendant insurer has followed suit.

225.    State Farm Defendants, Farmers Defendants, Progressive Defendants, Allstate Defendants, GEICO Defendants, USAA Defendants, Liberty Mutual Defendants, American Family and Country Mutual all refuse to pay Plaintiff Legends more than $48.00 per hour for body, refinishing and paint labor.

226.    Defendant insurers all refuse to pay Plaintiff Airport Auto  more than $48.00 per hour for body, refinishing and paint labor.

227.    State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendant, American Family, Liberty Mutual Defendants, Nationwide, Travelers, Safeway, UAIC have all refused to pay Plaintiff Jan's Spectrum more than $48.00 per hour for body, refinishing and paint labor.

228.    When State Farm Defendants' increased the market rate in 2008, the new market rate did not reflect a scientifically valid average of accepted body, refinishing and paint labor rates. Accordingly, the other Defendant insurers' agreement or concerted parallel conduct to uniformly establish a new market rate could only have been based on information from or provided by State Farm Defendants' internal and unpublished financial information to the other Defendant insurers.

229.    Over the last twenty years, in addition to illegally enforcing a statistically insignificant and deceptively manipulated market rate, Defendant insurers have engaged in other illegal conduct towards body shops, including Plaintiffs' businesses, to suppress labor rates.

230.    Plaintiffs Airport Auto and Jan's Spectrum have changed their posted labor rates over the years.  At each instance, however, Defendant insurers refused to pay Plaintiffs Airport

42

Auto' and Jan's Spectrum's increased posted labor rates and routinely assert that their posted labor rates increase did not conform to the market rates.

231.    A supervisor for Farmers Defendants, for example, specifically threatened Plaintiff Airport Auto that its posted rates were higher than other body shops in the area and that "bad news travels fast."

232.    Plaintiffs assert that discovery will reveal additional evidence to demonstrate that Defendant insurers have intentionally acted in concert, combination and by agreement to fix and suppress the labor rates for the body shop industry in Arizona.

    B.    Repair Process and Procedures

233.    There are three collision repair estimating databases in ordinary usage within the auto body collision repair industry: ADP (or Audatex); CCC; and Mitchell.

234.    State Farm Defendants and Allstate Defendants use ADP/Audatex, CCC and Mitchell.  But State Farm Defendants and Allstate Defendants uniformly generate estimates from all three databases and only submits the lowest estimate to Plaintiffs.

235.    Liberty Mutual Defendants and Defendant Safeway Insurance Company use or have used ADP/Audatex.

236.    GEICO Defendants, Farmers Defendants, Hartford Defendants, USAA Defendants, Travelers Defendants, Liberty Mutual Defendants, and Nationwide Defendants use or have used CCC.

237.    Progressive Defendants, Hartford Defendants, and Metropolitan Defendants use or have used Mitchell.

238.    The databases average costs associated with repair processes and procedures and utilize proprietary software to create estimates for the repair. The estimates that the databases generate include the ordinary and customary repair procedures, repair time (labor) and materials necessary to return the vehicle to pre-accident condition.

239.    The estimates from these databases are generally accepted within the body shop industry as reliable starting points, however, they typically underestimate the actual repair times

43

and materials, such that a body shop's expert opinions on repair procedure and materials pricing is required.   Specifically, the body shop remains charged with accessing the variability between the repair-scenario that the databases present and the actual needs of the particular repair.

240.   The databases maintain "procedures pages" ("p pages," as abbreviated throughout the industry) that set forth the repair times and materials for the anticipated repair of an *undamaged* vehicle using original manufacturer equipment, which is specifically designed to fit that particular vehicle.  Wrecked vehicles are obviously not undamaged and original manufacturer equipment is not always used.   Both factors significantly affect real world repair procedures, times and materials: it is much easier and takes less time to remove an undamaged door from an undamaged vehicle compared to removing a damaged door from a wrecked vehicle, where removal often requires prying the damaged components apart from each other before they can be removed from the vehicle.

241.   Plaintiffs subscribe to one or more of the estimating databases and utilize the same platform to generate estimates for individual repairs.

242.   Each Defendant insurer subscribes to one or more of the estimating databases and utilizes the same platform to generate estimates for individual repairs.   And, when a Defendant insurer retains a purported independent appraiser, the independent appraiser uses one or more of the three estimating databases to generate estimates for individual repairs.

243.   State Farm Defendants have represented to the body shop industry that it abides by and would continue to abide by the standard operations of the p-pages.  For example, at the 1994 National Autobody Congress & Exposition, State Farm Defendants' speaker, Gerry Westerfield, was presented with a question on how to handle State Farm Defendants' adjustors who refused to pay for standard p-page operations.  He responded:

> If a State Farm representative comes to your shop and says, "We don't pay for that, it's company policy," take it from me, we don't have that policy . . . So tell them, "I know your policy and that's not it.  Who is your supervisor?"

244.    Despite endorsement and routine use of the databases, Defendant insurers have employed a widespread, comprehensive, and uniform tactic of refusing to fully reimburse Plaintiffs for procedures and processes that are mandatory to return vehicles to pre-accident condition according to industry standards, the p-pages, and safety protocols.  Defendant insurers' widespread, comprehensive, and uniform conduct requires Plaintiffs to either perform substandard repairs, which places customers at risk and damages Plaintiffs' professional reputation, or perform quality work without reimbursement, which is economically impossible for Plaintiffs' over the long-term.

245.    Attached as Exhibit 3, is a non-exhaustive list of procedures and processes that Defendant insurers refuse to pay and/or refuse to pay in-full.

246.    Defendant insurers selectively rely on the definitive nature of the databases' estimates when doing so is to their financial advantage.  For example, if a repair requires twenty hours of labor to complete but the database's estimate notes that fifteen hours of labor is standard for that type of repair, Defendant insurers will cite to the database's estimate and refuse to pay for more than fifteen hours of labor time.

247.    Defendant insurers using the CCC and Mitchell databases, for example, routinely limit reimbursement for clear coating and paint materials even when the particular repair requires Plaintiffs to expend more time on the clear coating process or paint materials.

248.    Defendant insurers alter the database estimates to reduce the amount of labor time required and materials needed.  The databases' estimating software automatically notes, by underlining or with an asterisk, Defendant insurers' manual changes to the database's estimate. Typically, Defendant insurers designate the manual changes as "judgment items" without further explanation and citation to authority.

249.    Defendant insures' representatives often make manual changes to the database estimates while conducting a "desk review" (*i.e.*, without an in-person inspection of the vehicle) based only one Plaintiffs' estimates.

250.    As an example, USAA Defendants' agents employ a desk review procedure that arbitrarily eliminates procedures and/or reduces labor times—sometimes by as much as sixty-percent—without reason.

251.    Defendant insurers' manual changes to the database estimates, again, require Plaintiffs to perform substandard repairs, which places customers at risk and damages Plaintiffs' professional reputation, or perform quality work without reimbursement, which is economically impossible for Plaintiffs' over the long-term.

252.    Defendant insurers routinely make the following false or misleading statements in refusing to reimburse Plaintiff for procedures and processes that are mandatory to return vehicles to pre-accident condition according to industry standards, the p-pages, and safety protocols: (1) that particular procedures and processes are not required according to industry standards, the p-pages, and safety protocols; (2) that particular procedures and processes are included in another procedure or process and therefore payment for one is payment for another; and (3) that other body shops in the area do not perform or do not bill for a particular procedure or process.

253.    All Defendant insurers have made one or more of the aforementioned false or misleading statements to Plaintiff Airport Auto in refusing to reimburse Airport Auto for procedures and processes.  Most commonly, Defendant insurers use such statement in refusing to reimburse Airport Auto for feather, prime and block and color matching.

254.    The following Defendant insureds have refused, or have threatened to refuse, to pay Plaintiff Legends, reasoning that "other shops do not bill for it:" State Farm Defendants, Farmer Defendants, Progressive Defendants, GEICO Defendants,  Allstate Defendants and Country Mutual.

255.    The following Defendant insurers have refused, or have threatened to refuse, to pay Plaintiff Legends, for repairs with statements such as "at this shop it is a total loss, at other shops it would be repairable:" GEICO Defendants, Allstate Defendants, and Country Mutual.

256.    In defiance of databases' estimates that specifically note that a procedure or process is *not* included in another repair procedure or process (*i.e.*, it must be billed and paid as a separate

46

item), Defendant insurers routinely exclude certain processes and procedure that are necessary to return a vehicle to its pre-accident condition.

257.    In addition to non-payment for feather, prime and block and color matching procedures, State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, Liberty Mutual Defendants, Hartford Defendants, Travelers Defendants, Safeway and UAIC frequently refuse to pay (or only partially pay) Airport Auto for repairing and refinishing pinch-welds.

258.    All Defendant insurers uniformly refuse to pay for "feather, prime and block"[40] procedures on the grounds that the procedures are included in body labor operation.  Feather, prime and block is not required on every repair but, when it is performed, each of the three aforementioned estimating databases state that it is a refinish operation and *not* an included operation.

259.    The following Defendant insurers have refused, or have threatened to refuse, to pay Plaintiff Legends, for repairs with statements such as "if we pay tint, we do not pay blend:" Farmers Defendants, Progressive Defendants, GEICO Defendants, and USAA Defendants.

260.    GEICO Defendants' employees have refused to pay Plaintiff Legends for certain processes and procedures, stating that "we don't pay to clear to the edge of continuous panel."

261.    State Farm Defendants, USAA Defendants, Allstate Defendants, Liberty Mutual Defendants, GEICO Defendants and Nationwide Defendants also refuse to pay for "denib and finesse" (also known as, "color, sand and buff" or "color, sand and polish") when the procedure is required and all three of the aforementioned estimating databases recognize as a refinish operation and *not* an included operation.

262.    Plaintiffs assert that discovery will produce information and/or documentation to establish the universe of procedures and processes that the Defendant insurers refuse to pay for.

C.    Paint and Materials

---

[40] A refinish operation that completes bodywork repair from 150-grit smoothness to the condition of a new undamaged panel.

263.     As previously described, paint and materials costs were traditionally calculated based on an hourly rate and compensated separately from paint labor rates.  Paint and materials rates were intended to compensate body shops for the actual cost of paint and materials used in a repair.

264.     But, as also previously described, contemporary vehicle finishes and the materials necessary to complete the repairs have costs that have outpaced the traditional calculation methods.

265.     The aforementioned estimating databases specifically state that paint and materials costs are *not* included in the repair operations, however, Defendant insurers—through their combined market share and through agreement with other Defendant insurers—uniformly refuse to reimburse or only partially reimburse Plaintiffs for paint and materials costs expended on repairs to Defendant insurers' insureds and claimants.

266.     For example, the following Defendant insurers have refused, or have threatened to refuse, to pay Plaintiff Legends, for repairs with statements such as "tint color, flex additive and cover car included materials:" Liberty Mutual Defendants and Country Mutual.

267.     State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, USAA Defendants, Liberty Mutual Defendants, Hartford Defendants, Nationwide Defendants, Metlife Defendants, and Travelers Defendants have all placed ceilings reimbursement rate to Airport Auto for paint materials.

268.     Furthermore, even when Airport Auto submitted paint materials costs to Defendant insures that were determined using a PMC, Defendant insurers capped reimbursement rates to Airport Auto for paint materials, which made use of PMCs futile and disincentivized accuracy.

269.     Defendant insurers all assert that the paint and materials rate they pay is the going- or market-rate even though *none* of the Defendant insurers have conducted a statistically significant survey of market paint and materials rates.

270.     Notwithstanding the statistically fatal flaws in State Farm Defendants' survey, every other Defendant insurer parrots the same going- or market-rate for paint and materials as the one that State Farm Defendants reached.

271.     Plaintiffs have provided invoices to every Defendant insurer demonstrating that the actual cost of paint and materials exceeds the reimbursed rates from the respective Defendant insurers.  But Defendant insurers utilize their combined market share and agreements with other Defendant insurers to uniformly and routinely refuse to pay or fully compensate Plaintiffs for paint and materials costs.

D.      Parts

272.     As previously mentioned, aftermarket and salvaged parts have significant safety, quality control, and performance issues when compared to OEM parts.

273.     But Defendant insurers' employ a widespread, comprehensive, and uniform scheme of refusing to reimburse or only partially reimbursing Plaintiffs for repairs unless they use aftermarket or salvage parts.  The illegal conduct again places Plaintiffs in a position of either performing substandard repairs, which places customers at risk and damages Plaintiffs' professional reputation, or performing quality work without reimbursement, which is economically impossible for Plaintiffs' over the long-term.

274.     State Farm Defendants conduct is done with knowledge that there are significant safety issues for repairs involving crash related parts: State Farm Defendants incorporated the following language into DRP arrangements, "the following crash related parts, when subject to certification standards developed by an organization approved by State Farm, will be certified unless requested by the owner: bumper components, lighting components, radiator supports/tie bars and associated mounting components, and outer sheet metal and plastic/composite parts."

275.     State Farm Defendants routinely refuse to pay or only partially pays Plaintiffs for repairs unless they use salvaged bumper components, lighting components, and radiator supports for repairs.  For example, State Farm Defendants have required Plaintiff Airport Auto to use: remanufactured (salvaged) bumper covers, front and rear, and salvaged bumper assemblies; salvaged side panels; salvaged radiator panels and cross-members; recycled (salvaged) headlamp assemblies and side-marker lenses; salvaged headlamp panels; salvaged tail lamp assemblies; and salvaged radiator supports.

276.    GEICO Defendants conduct is also done with knowledge that there are significant safety issues for repairs involving crash related parts: In January 2010, GEICO Defendants announced that they would no longer specify aftermarket parts for bumper reinforcements, brackets or energy absorbers due to safety concerns.

277.    GEICO Defendants continue to specify and require Plaintiffs to use aftermarket bumper parts such as brackets, supports and absorbers.

278.    Defendant insurers also routinely require, most commonly on new cars, Plaintiff Airport Auto to use aftermarket parts that void the vehicle manufacturers' warranty.  Radiator condensers are one of the most common aftermarket parts specified even though their use voids the vehicle's warranty.

279.    State Farm Defendants, GEICO Defendants, Liberty Mutual Defendants, Progressive Defendants and Allstate Defendants purport to warranty repairs for as long as the consumer owns the repaired vehicle, however, these particular Defendant insurers' specifically disclaim the warranty for repairs using aftermarket and/or salvaged parts.

280.    For example, GEICO Defendants "owner limited warranty" only covers "Quality Replacement Body Parts (Parts not manufactured by the manufacturer)" as being "free of defects in material and workmanship and meet generally accepted industry standards."   GEICO Defendants' warranty does not apply to salvaged parts and does not cover repair work.  In reality, GEICO Defendants routinely require Plaintiffs to use salvaged parts to avoid warrantying parts and refuses warranty coverage for the actual work performed.

281.    Progressive Defendants' estimates contain the following statement, "This estimate has been prepared based on the use of crash parts supplied by a source other than the manufacturer of your motor vehicle.  The aftermarket crash parts used in the preparation of this estimate are warranted by the manufacturer or distributor of such parts, rather than the manufacturer of your vehicle."  Progressive Defendants require Plaintiffs to use aftermarket parts and leave it to the insured/claimant to raise warranty issues with the aftermarket part manufacturer or distributor.

50

282.    Allstate Defendants require Plaintiffs to use aftermarket parts but state the following on estimates, "The insurance company guarantees the fit and corrosion resistance of any aftermarket/competitive outer body crash part that are listed on this estimate and actually used in the repair of your vehicle for as long as you own it. If a problem develops with the fit or corrosion resistance of these parts, they will be repaired or replaced at the insurance company's expense." Under Allstate Defendants' warranty language, Allstate Defendants are not liable and they will not repair a vehicle when they require Plaintiffs to install a salvage or aftermarket radiator support, bumper assembly, hood hinge, steering column or assembly, or airbag or airbag sensor, and that part fails.

283.    Liberty Mutual Defendants run an extensive television advertisement campaign purporting to provide a lifetime guarantee on repairs; when, in reality, they uniformly disclaim liability and state that the manufacturer or distributor warrants the parts that Liberty Mutual Defendants require Plaintiffs to install.

284.    Plaintiffs—faced with the previously mentioned untenable position—are damaged in several ways as a result of Defendant insurers' conduct. First, Plaintiffs commonly install OEM parts to ensure quality workmanship and crashworthiness despite Defendant insurers' refusal to reimburse Plaintiffs for the additional cost. Second, if Plaintiffs agree to use aftermarket or salvaged parts, Plaintiffs must routinely spend additional labor hours modifying, cleaning or repairing the specified part. Defendants refuse to pay Plaintiffs for the additional labor. Under either situation, Defendant insurers' exploit their collective market share and arrangements with other Defendant insurers to illegally profit at Plaintiffs' expense.

285.    State Farm Defendants, Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, Liberty Mutual Defendants, USAA Defendants, American Family, Nationwide Defendants, Hartford Defendants, Safeway and UAIC frequently specify use of aftermarket or used parts but then refuse to pay Airport Auto for the difference in value between the insurer specified part and the part actually used for the repair when Airport Auto—based on

51

professional repair experience—determines that the insurer specified part is unsafe or unfit, or the vehicle owner specifies use of a different part.

286.    Farmers Defendants, Progressive Defendants, GEICO Defendants, Allstate Defendants, Liberty Mutual Defendants, American Family, Nationwide Defendants, Hartford Defendants, Safeway and UAIC also routinely refuse to pay for labor required to modify or prefit aftermarket or used parts that they specify.

287.    Metlife Defendants have also denied reimbursement to Plaintiff Legends for costs associated with aftermarket parts that they specified but that were delivered in damaged condition and then were later unavailable from Metlife Defendants' specified source.

288.    As with State Farm Defendants' setting of the purported market rate, State Farm Defendants set the reimbursement rates for mark-up of parts and the remaining Defendant insurers—through agreement between other Defendant insurers and/or parallel conduct—follow State Farm Defendants.   In years past, for example, State Farm Defendants would reimburse Plaintiff Airport Auto for 35% mark-up on parts.  The remaining Defendant insurers followed-suit and also paid Plaintiff Airport Auto 35% mark-up on parts.  But recently, State Farm Defendants unilaterally reduced the amount of reimbursement to Plaintiff Airport Auto for mark-up to 20%. Plaintiff Airport Auto—for the reasons stated herein—was not permitted an opportunity to negotiate.   Defendant insurers refuse to reimburse Plaintiffs Airport Auto and Legends for more than 20% mark-up on parts.

289.    Defendants Mercury routinely refuses to pay Legends for storage of their insureds'/claimants' vehicles.  GEICO Defendants have similarly refused to pay large portions storage fees associated with repair costs to GEICO insured vehicles.

290.    Defendant insurers also uniformly refuse to reimburse or only partially reimburse Plaintiffs for parts that brake during the disassembly of the vehicle.  For example, State Farm Defendants, GEICO Defendants, Progressive Defendants, Allstate Defendants and Defendant Country Mutual Insurance Company have all made such refusals to Plaintiff Legends.

291.    Additionally, State Farm Defendants, Progressive Defendants and Defendants American Family Mutual Insurance Company have refused to reimburse Plaintiff Legend Collision, LLC for replacing parts that are irreparable.

292.    In the face of Defendant insurers' combined market share and arrangements with other Defendant insurers, Plaintiffs' *only* alternatives to Defendant insures' unified reimbursement refusal and insistence on the use of aftermarket or salvaged parts is to purchase the appropriate part or perform additional work without reimbursement for the extra expense or labor.  Plaintiffs have suffered and continue to suffer economic damages as a direct and proximate result of Defendant insurers' aforementioned illegal conduct.

Defendant Insurers Steer Customers from Plaintiffs to Preferred/Captive Repair Facilities

293.    Steering is the practice of convincing or attempting to convince a consumer to withhold patronage from an auto repair shop for failing to comply with the insurers' demands (typically, relating to lowering labor rates or usage of aftermarket or salvaged parts).

294.    Steering generally involves an insurer relaying false or misleading information to the insured or claimant about an auto repair shop after the insured or claimant makes an initial determination to have the auto repair shop perform the repairs.

295.    Insurance companies have also used economic incentives to steer their insured or claimants away from auto repair shops that have historically failed to comply with the insurers' demands and towards preferred or captive auto repair shops.

296.    Defendant insurers have engaged in the widespread, comprehensive, and uniform practice of steering, or threatening to steer, Plaintiffs' customers and/or Defendant insurers' insureds and/or claimants away from Plaintiffs' shops and to a preferred or captive auto repair shops as a means of financially punishing Plaintiffs for noncompliance with Defendant insurers' demands relating to, *inter alia*, labor rates, parts sourcing and pricing, procedures and processes utilized and/or billed, and paint and materials costs.

297.    After the consumer selects one of the Plaintiffs' shops as their choice repair facility, the respective Defendant insurer's agent provides a document containing, or verbally transmits,

53

one or more of the following false or misleading statements: (1) the consumer is required to take their vehicle to an approved shop for repairs; (2) the selected shop is not on the respective Defendant insurer's preferred list; (3) the insurer has received complaints about the quality of the respective Plaintiff's workmanship; (4) if the consumer takes their vehicle to the selected shop, repairs will take too long and the consumer will run out of rental car reimbursement and will be responsible for paying rental charges out of their own pocket; (5) the selected shop overcharges and the consumer will have to pay the difference; (6) the insurer has received complaints about the respective Plaintiff's shop from other consumers; (7) the consumer is required to take their vehicle to an approved facility for an estimate before they are allowed to go to the repair facility of their choosing; (8) the respective Defendant insurer will provide a guarantee on repairs performed at its preferred shop; and (9) the respective Defendant insurer cannot guarantee the repairs performed at Plaintiffs' shop if it is the consumer's choice repair facility.

298.    GEICO Defendants, for example, encourage agents to tell their consumers that they are required to take their vehicle to an approved facility for an estimate before they are allowed to go to the repair facility of their choosing.  If GEICO Defendants' agent successfully direct a consumer's vehicle to one of its DRP or captive shops for an estimate, GEICO Defendants mark the file as a successful "capture." If the consumer's vehicle is repaired at the GEICO Defendants' preferred DRP or captive shop, GEICO Defendants designates the file as a successful "retention." GEICO Defendants' claims handling documents refer to this process as "capture and retention."

299.    GEICO Defendants' internal documents pressure and incentivize their agents to capture and retain consumers that express desire to have Plaintiffs' shops perform the repair. GEICO Defendants correlate successful "captures" and "retentions" to increased company profits and rewards its agents that meet "capture" and "retention" goals with increased profit sharing bonuses.

300.    Farmers Defendants similarly incentivize their insurance adjustors and approve of raises only if the insurance adjustor's average monthly estimates are below the average monthly estimates of all Farmers Defendants' insurance adjustors' for the relevant area.

301.    Defendant insurers have employed these uniform steering practices for several years.

302.    Below are particular examples of steering and boycotting; however, the vast majority of specific events are within the sole possession and control of the Defendants, either maintained in Defendant insurers' representatives' claim diary entries or the recorded telephone conversations between the Defendant insurers' and their insureds and claimants when claims are made or discussed.

303.    Plaintiffs assert that discovery will reveal evidence to further demonstrate that each and every Defendant insurer has engaged in parallel conduct towards Plaintiffs.  But, throughout the Complaint and below, Plaintiffs have asserted specific, direct evidence of instances of steering, both successful and unsuccessful, and thus boycotting to raise a more than reasonable probability that Defendant insurers' do engage in the behavior alleged.

A.    <u>Legends Collision</u>

304.    In July 2014, an insured of GEICO Defendants was in an automobile accident that left her hospitalized with personal injuries and an extensively damaged vehicle.  After the accident, at GEICO Defendants' direction (and *not* the insured's) the vehicle was towed to Gerber Collision & Glass ("Gerber"), one of GEICO Defendants' DRP shops, for repair.  The insured inquired whether she could have her vehicle repaired at Legends.  GEICO Defendants' agent told the insured that she would be responsible for the towing fees, that Legends would have to submit estimates for the repair and that the agent would have to approve the estimates. GEICO Defendants' agent also warned the insured that she had almost expended all of her rental car reimbursement despite the fact that GEICO Defendants' steering the vehicle to a shop not approved by the insured delayed the repair timing.

305.    The insured expressed concerned to GEICO Defendants' agent about her ability to pay for towing fees out of pocket due to her financial condition. After reading several negative consumer reviews about Gerber, the insured also told GEICO Defendants' agent that she was concerned about the quality of the repair if Gerber performed the work.  GEICO Defendants' agent

assured the insurer that Gerber would perform the vehicle repairs to the same standards as Legends and told her that her insurance deductible would be waived if the vehicle was repaired at Gerber.

306.    The insured, believing GEICO Defendants' agent's statements agreed to have Gerber restore the damaged vehicle.

307.    In September 2014, the insured met with GEICO Defendants' agents and a manager from Gerber to discuss the vehicle repairs because the original repairs that Gerber performed were grossly inadequate. For example, the moon-roof sliders would not open and were bent, there was significant overspray, chipped and missing paint, grease on the headliner and putty on the right front fender that was baked into the top coat, and the vehicle died numerous times when trying to start it.

308.    At this time, one of GEICO Defendants' agents told the insured that she should give Gerber an opportunity to warranty their work.   The insurer responded that she needed some additional time to think about how she wanted to proceed.

309.    The insured later discovered additional issues with the vehicle, including, among other things, the trunk, hood and back doors were not flush, there was paint missing from the tops of the doors, and there were multiple scratches that were left unrepaired.  After discovering these additional issues, the insured brought her vehicle to Legends for re-repair.

310.    Legends generated an estimate to repair the insured's vehicle to industry standards but GEICO Defendants refused to authorize payment for the repairs.  For nearly eight-months, Legends was precluded from repairing the vehicle because of GEICO Defendants' inaction. GEICO Defendants ultimately declared the vehicle a total loss in April/May 2015 but refused to fully reimburse Legends for storage fees and rental vehicle charges that were required as a result of GEICO Defendants' inaction.  Plaintiff Legends was damaged as a direct and proximate result of GEICO Defendants' steering and exploitation of their market share power.

311.    Further, as previously mentioned, Defendant Encompass has threatened that it "will tell every customer that wants to come to [Legends] that [Legends] overcharge and [the customer] will have to pay the difference."

312.     Additionally, as another specific example, a Defendant Encompass claimant brought their damaged vehicle to Legends for repair and Legends submitted a repair estimate to Encompass.  Encompass's agent directed a contrary repair procedure, which Legends refused to perform because of safety concerns and workmanship quality issues. Encompass, in turn, set a letter to Legends' prospective customers stating the following: "Unfortunately, at this time I have been unable to reach a repair agreement with your chosen shop . . . . Unfortunately, the repair facility you have chosen refuses to attempt any of these repairs[.] . . . If you chose to have [Legends] repair your vehicle, you will be responsible for the difference from what is already approved & estimated. [¶]   At your request, I can recommend a qualified repair facility in your area that can complete the repairs for the amount of my estimate.  If you choose this alternative, we will also guarantee the workmanship of the repairs listed on the enclosed estimate for as long as you own the vehicle."

313.     Defendant Mercury has threatened Legend that they will tell customers that want Legends to perform their vehicle repair work that Legends overcharges and that the customer will have to pay the difference.

B.     Jan's Spectrum Defendants

314.     A twenty-year repeat Jan's Spectrum customer, who was insured through State Farm Defendants, brought his vehicle in for an estimate for damage to his BMW.  The customer said he still needed to contact State Farm Defendants to determine coverage for the estimated damage.  Jan's Spectrum, after not hearing from the customer for a few days, sent an email to follow up with the customer on the status.  The customer emailed back stating: "[b]ecause of the limitations and requirements my insurance company posed, I have already gotten the car repaired."

315.     A prior customer of Jan's Spectrum, who was rear-ended by a driver that was insured with State Farm Defendants, called to inquire as to whether Jan's Spectrum had contracted with State Farm Defendants (*i.e.*, if Jan's Spectrum was a DRP for State Farm Defendants) because State Farm Defendants had sent her a list of their authorized body shops.  Jan's Spectrum explained that it was not a DRP for State Farm Defendants but that the prior customer was still entitled to

have her vehicle repaired at Jan's Spectrum.  The prior customer understood and said that she was going to call State Farm Defendants because she "preferred to just go to [Jan's Spectrum] but they'll probably want [her] to go to one of their [preferred DRP shops]."  The call ended and the prior customer never returned to Jan's Spectrum.

316.    Another past customer of Jan's Spectrum was in an accident and called Jan's Spectrum to tow the vehicle into Jan's Spectrum for the repair. The customer told Jan's Spectrum that he was next going to call his insurance company, State Farm, to file a claim and he would call Jan's Spectrum back with a time to pick up the vehicle.  The past customer called Jan's Spectrum back and said that State Farm Defendants told him that if he wanted Jan's Spectrum to perform the repairs, it would take fifteen-days for them to send an appraiser to authorize the repair; however, State Farm Defendants would authorize the repair immediately if the past customer brought the vehicle to one of State Farm Defendants' DRP shops.  The customer brought the vehicle to one of State Farm Defendants' DRP shops for the repair.

317.    Similarly, a potential customer, who State Farm Defendants insured, brought in a vehicle to Jan's Spectrum for repair.  Jan's Spectrum sent the customer an estimate of approximately $2,600 to repair the damaged vehicle.  But, the next day, the customer responded via email that he "spoke with State Farm and it seems they need me to go to one of their shops." The customer never returned to Jan's Spectrum.

318.    Jan's Spectrum's long-time customer, who was insured through Defendants Safeco Insurance Company of America ("Safeco"), brought her vehicle to Jan's Spectrum to repair storm damage to her vehicle. When Safeco's agent called Jan's Spectrum's customer to tell her that he was on his way to her residence to inspect the vehicle, Jan's Spectrum's customer responded that the vehicle already at Jan's Spectrum.  Safeco agent responded, "well [Jan's Spectrum] like to charge more than what Safeco policies allow for labor/part."  Safeco's agent then, unprompted, stated that Safeco was in a lawsuit with Jan's Spectrum.  Jan's Spectrum's customer responded by stating that her family has always used Jan's Spectrum for vehicle repairs/service related or not related to insurance claims, and that the lawsuit does not have anything to do with her.  Safeco's

agent responded by stating "if you are going to use [Jan's Spectrum], then you kind of are related to the lawsuit." Jan's Spectrum's customer responded that the topic was not appropriate to discuss and the conversation was ended shortly thereafter. Jan's Spectrum, despite Safeco's attempts to steer the long-term client away, performed the repairs.

319.    Farmers Defendants drastically reduced the volume of vehicles that it sent to Jan's Spectrum after Plaintiffs filed this lawsuit. Between 2008 and 2014, Jan's Spectrum performed services on 807 vehicles for Farmers Defendants, or approximately 115 vehicles per year (or 29 vehicles per quarter). From January 1, 2015 to September 16, 2015, Jan's Spectrum has only repaired 19 vehicles insured by Farmers Defendants. Based on seven years of work history as a DRP for Farmers Defendants, Jan's Spectrum expected to perform repairs on approximately 86 vehicles insured by Farmers Defendants, which *four-times* more than actually realized, during this period.

C.    Airport Auto

320.    State Farm Defendants commonly inquire as to Airport Auto's DRP statuses before sending an estimator and, when Airport Auto states that they are not a State Farm DRPs, State Farm Defendants respond that it will take longer for the estimator to review the subject vehicle. State Farm Defendants' intentional delay has resulted in State Farm Defendants' insureds and claimants taking their vehicles to a State Farm DRP instead of having the vehicle repaired at Airport Auto.

321.    GEICO Defendants, Allstate Defendants, Safeway and UAIC routinely refuse to provide Airport Auto with rental reservation numbers, which authorize rental vehicle charges for their insureds and claimants, until an adjustor reviews the vehicle. GEICO Defendants, Allstate Defendants, Safeway and UAIC purposefully delay dispatching adjustors to Plaintiffs businesses to delay rental authorization. Meanwhile, GEICO Defendants, Allstate Defendants, Safeway and UAIC tell their insureds and claimants that they will authorize rental vehicle charges immediately if the vehicle is brought to one of their preferred DRP shops.

322.    As a specific example, Airport Auto towed an owner's vehicle that Allstate Defendants insured to their shop and performed an estimate.  The Allstate Defendants' insured authorized Airport Auto's repair order for $13,377.04.  Airport Auto, for safety and liability reasons, has a policy of requiring all non-Airport Auto employees to sign-in on a sheet at the front-desk.  Allstate Defendants' agent refused to sign-in and convinced Airport Auto's customer to have the vehicle repaired at an Allstate Defendant DRP shop instead.

323.    Progressive Defendants routinely inform insureds and claimants that express an interest in having Airport Auto perform the repairs that if the vehicle is drivable, it must first go to a Progressive Defendant DRP for an estimate.  If the insured or claimant does not first bring the damaged, but drivable, vehicle to a Progressive Defendant DRP, Progressive Defendants routinely refuse to dispatch a field estimator.

324.    As another specific example of GEICO Defendants' steering, GEICO Defendants towed an insured's vehicle to Gerber. The insured, concerned about negative reviews related to Gerber requested for the vehicle to be repaired at Airport Auto.  GEICO Defendants' response was to tow the vehicle to another Gerber repair facility, where the vehicle repair was initiated.  The second Gerber repair facility issued a repair estimate of approximately $8,500 to repair the vehicle. The repair estimate included a process of, *inter alia*, remanufacturing (rather than replacing) composite wheels on a vehicle that only had 37 total miles.  Unsatisfied with the estimate and Gerber's recommended repair, the insured again insisted that GEICO Defendants permit Airport Auto to repair the vehicle.  Ultimately, the vehicle was towed—entirely torn apart—to Airport Auto.  Airport Auto's investigation revealed significant structural damage that Gerber failed to assess and Airport Auto provided an estimate of over $19,000 to GEICO Defendants to repair the vehicle. GEICO Defendants accused Airport Auto of creating damage that was not previously on the vehicle; however, GEICO Defendants eventually declared the vehicle a total-loss.

325.    Since filing this lawsuit, State Farm Defendants, Liberty Mutual Defendants and American Family have steered vehicles away from Airport Auto.

326.    Between 2009 and 2014, Airport Auto performed services on 161 vehicles for State Farm Defendants, or approximately 27 vehicles per year (or 6-7 vehicles per quarter).  From January 1, 2015 to September 15, 2015, Airport Auto has only repaired 13 vehicles insured by State Farm Defendants.  Based on six years of work history for State Farm Defendants, Airport Auto expected to perform repairs on approximately 20 vehicles insured by State Farm Defendants, which is approximately *one-and-a-half-times* more than actually realized, during this period.

327.    Between 2009 and 2014, Airport Auto performed services on 63 vehicles for Liberty Mutual Defendants, or approximately 10-11 vehicles per year (or 2-3 vehicles per quarter).  From January 1, 2015 to September 15, 2015, Airport Auto has only repaired 2 vehicles insured by Liberty Mutual Defendants.  Based on six years of work history for Liberty Mutual Defendants, Airport Auto expected to perform repairs on approximately 8 vehicles insured by Liberty Mutual Defendants, which *four-times* more than actually realized, during this period.

328.    Between 2009 and 2014, Airport Auto performed services on 95 vehicles for American Family, or approximately 16 vehicles per year (or 4 vehicles per quarter).  From January 1, 2015 to September 15, 2015, Airport Auto has only repaired 6 vehicles insured by American Family.  Based on six years of work history for American Family, Airport Auto expected to perform repairs on approximately 12 vehicles insured by American Family, which *two-times* more than actually realized, during this period.

<u>Defendant Insurers' Conduct is Malicious, Punitive and Intentional</u>

329.    There is no legitimate business interest associated with Defendant insurers' widespread, comprehensive, and uniform conduct of utilizing their combined market share and agreements with other Defendant insurers to steer Plaintiffs' customers and/or Defendant insurers' insureds and/or claimants away from Plaintiffs' and to preferred or captive auto repair shops and coerce Plaintiffs' compliance with Defendant insurers' demands.

330.    Defendant insurers know that if they uniformly refuse to pay the full cost of repairs and combine those refusals with steering customers away from Plaintiffs' businesses and towards preferred or captive body shops, Plaintiffs and other similarly situated body shops will be

compelled to comply with, *inter alia*, Defendant insurers' price fixing of labor rates and for replacement parts and paint and materials costs, compulsory use of substandard or dangerous replacement parts, and compulsory use of parts procurement programs.

331. Defendant insurers' knowingly misrepresent that repairs will take longer at Plaintiffs' shops when the reality is that delays in repair process are the sole responsibility of Defendant insurers.

332. For example, Defendant insurers commonly delay sending agents to Plaintiffs' shops to perform initial evaluations at the beginning of the repair process. These delays are accompanied with threats stating that Defendant insurers will withhold payment if Plaintiffs begin performing repair work before the initial evaluation is performed.

333. Similarly, Defendant insurers frequently inform customers and Plaintiffs that an estimator will be sent but days or weeks will pass and phone calls to determine the status will go unanswered without the estimator showing up at Plaintiffs' shop to perform the initial evaluation. When phone calls are answered, it is typical for Defendant insurers to inform Plaintiffs that an estimator will be re-dispatched but, again, they fail to show up. After considerable time has passed, it is routine for the Defendant insurers' agent to show up and claim that the repair had "just been assigned." During the delay, Plaintiffs are unable to begin the repair process for fear of nonpayment.

334. Defendant insurers also consistently delay responses to estimate supplements. Defendant insurers, typically after days or weeks have passed, respond to Plaintiffs denying receipt of the supplement. Defendant insurers deny receipt even when Plaintiffs provide email- or facsimile-delivery confirmation, which further delays the repair procedure.

335. Defendant insurers, as with the initial repair, refuse to allow Plaintiffs to perform additional work pursuant to the estimate supplement until an agent re-inspects the vehicle or authorizes the supplemental work request. Again, Defendant insurers uniformly delay the re-inspection or supplemental authorization.

336.    Defendant insurers intentionally misrepresent to Plaintiffs' customers that Defendant insurers cannot guarantee Plaintiffs' work but that the respective Defendant insurer will guarantee the work if the customer has their vehicle repaired at the respective Defendant insurer's preferred or captive shop.

337.    Defendant insurers' statements are misleading because Defendant insurers do not perform repair work and, therefore, there is nothing for them to guarantee.  But, as phrased, Defendant insurers' guarantee leads reasonable consumers to believe that the respective Defendant insurers guarantees the repairs.

338.    Defendant insurers' preferred or captive body shops have the ability to guarantee the repair work and, in some instances, Defendant insurers require preferred or captive body shops to guarantee their work.  But reality has demonstrated that Defendant insurers use the preferred or captive body shops' guarantee as a means of dissuading the customer from having their vehicle re-repaired at a non-preferred or non-captive body shop, such as Plaintiffs' shops.

339.    Defendant insurers' statements regarding guarantees are also deceitful because they lead reasonable consumers to assume that Plaintiffs do not guarantee their work.

340.    Defendant insurers' only intention for making the false and misleading statements regarding guarantees of work performed on their customer's vehicles is to steer business away from Plaintiffs' businesses and compel Plaintiffs' compliance with demands.

341.    In another case, *Price's Collision Center, LLC v. Progressive Hawaii Insurance Company*, Case No. 12-873, pending in the Middle District of Tennessee, a long-term employee of Progressive Hawaii, Mr. David Edwards, affirmed that Progressive targets specific shops for punishment.  He further affirmed that Progressive made derogatory statements about noncompliant body shops to consumers about the noncompliant body shops' quality of work.

342.    According to Mr. Edwards, Progressive deliberately refused to pay legitimate repair costs when it was unsuccessful in steering customers away from the noncompliant body shops and to preferred shops.

343.     Progressive, as Mr. Edwards affirmed, coerced consumers by telling them that they would have to pay extra for going to the shop of their choice but that they would not have to pay extra if the consumer went to a Progressive-preferred or captive body shop.  *See* Exhibit 4, Mr. David Edward's affidavit.

344.     Mr. Edwards' affidavit was particular to Progressive Hawaii Insurance Company, however, Progressive Defendants' have acted in the same manner towards Plaintiffs and other similarly situated body shops.

345.     No legitimate business interest sanctions Defendant insurers' practices of defaming Plaintiffs with accusations of misdeeds and malfeasance or financially punishing Plaintiffs when the billed amounts are higher (as a result of Defendant insurers' own action or inaction) or the rates charged are higher than they wish to pay.

346.     Defendant insurers' know that such statements are false, deceitful and misleading, yet Defendant insurers intentionally, willfully and maliciously, without furtherance of a legitimate business interest, uniformly engage in such conduct with the intent to injure and damage Plaintiffs.

Opportunities for Defendants to Conspire

347.     There are a significant number of opportunities for Defendant insurers' agents, whom individually have sufficient corporate influence and decision-making authority, to conspire.

348.     Opportunities to conspire typically take place at the national level.

A.     Trade Associations

349.     There are three major insurance industry trade associations: American Insurance Association (AIA); Property Casualty Insurer Association of America (PCI); National Association of Mutual Insurance Companies (NAMIC).

350.     The following Defendant insurers are members of AIA: Hartford Defendants, Safeco Insurance Company of America, Travelers Defendants, and USAA Defendants.  In addition to general membership, over the course of at least ten-years, the aforementioned Defendant insurers have all served in positions of authority within AIA, including on the AIA board.

351.    The following Defendant insurers are members of PCI: Allstate Defendants, GEICO Defendants, Liberty Mutual Insurance Company, and Progressive Defendants. In addition to general membership, over the course of at least ten-years, the aforementioned Defendant insurers have all served in positions of authority within PCI, including on the PCI board.

352.    The following Defendant insurers are members of NAMIC: State Farm Defendants and Nationwide Defendants.  In addition to general membership, over the course of at least ten-years, the aforementioned Defendant insurers have all served in positions of authority within NAMIC, including on the NAMIC board.

353.    The corporate agents representing the Defendant insurers in board positions hold, almost exclusively, the highest executive-level positions.

354.    For example, GEICO Defendants' CEO and Chair Tony Nicely has frequently held a position on the PCI's board of governors.  Others who have served over the years include, but are not limited to, Mr. Edmund Kelly, Defendant Liberty Mutual Insurance Company's former chairman and CEO, and Mr. Thomas Wilson, Allstate Defendants' president, chairman and CEO.

355.    State Farm Defendants and Nationwide Defendants have been members of NAMIC since at least 1961.  The list of State Farm Defendants' and Nationwide Defendants' executives who have served on NAMIC's board and various executive committees is extensive.

356.    Board meetings and other leadership obligations regularly bring the high ranking members of Defendant insurers together, specifically to discuss insurance issues, advance insurance interests, lobby for legislative favor and generally increase the profitability of the insurance industry.

357.    Furthermore, AIA, PCI and NAMIC frequently bring their members and board together, which includes Defendant insurers' agents, specifically for the purpose of advancing the insurance industry.  For example, the associations worked together to prepare and present a joint statement on Senate Regulatory Reform Legislation, to lobby Congress to renew the Terrorism Risk Insurance Act, and regarding the annual PIC Insurance Joint Industry Forum.

358.    Based upon available information and belief, Plaintiffs assert that discovery will provide additional evidence as to the remaining Defendant insurers' membership and participation in one or more insurance trade associations.

B.    Insurance Institute of Highway Safety

359.    The Insurance Institute of Highway Safety (IIHS) is described as "an independent, nonprofit scientific and educational organization dedicated to reducing the losses—deaths, injuries and property damage—from crashes on the nation's roads."

360.    IIHS asserts, among other things, that it conducts scientific tests relating to vehicle crash worthiness and crash avoidance and rates the results.  The results are often used to advertise and market the safety of certain vehicles and crash parts.

361.    Defendant insurers, except for Defendant UAIC, are members of IIHS, either directly or through membership of their parent corporations. Defendant insurers that are currently part of the board of directors includes: GEICO Defendants' president and CEO, Mr. John Mullen; Progressive Defendants' general manager, Mr. David Skove; State Farm Defendants' vice president and actuary, Ms. Angela Spark; Liberty Mutual Defendants' vice president, Mr. Timothy Sweeney; Hartford Defendants' vice president, Mr. Randy Termeer; Traveler Defendants' president, Mr. Greg Toczydlowski; and Nationwide Defendants' association vice president, Mr. William Windsor, Jr.

362.    IIHS membership and board involvement provides the Defendant insurers and other national insurers with opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans.  Further, IIH is influential in establishing the legitimacy of parts, including aftermarket parts as safe alternatives of like kind and quality to OEM parts.

363.    As discussed above, Defendant insurers regularly and routinely compel purchase and use of aftermarket and other non-OEM crash parts for use in the repairs at a financial and reputational detriment to Plaintiffs, a safety and functionality risk to Defendant insurers' insureds and claimants, and as a financial benefit to Defendant insurers. IIHS, therefore, provides

combination and conspiracy opportunities and incentives for multiple avenues of mutual interest and profit to the Defendant insurers.

C.     Certified Automotive Parts Association

364.    Certified Automotive Parts Association ("CAPA") represents itself as a non-profit organization that was established in 1987 to develop and oversee testing programs to guarantee the suitability and quality of automotive parts.  More specifically, CAPA's testing programs have focused on aftermarket parts.

365.    CAPA purports to conduct studies of and set the quality standards for aftermarket parts.

366.    CAPA was founded and predominantly funded by representatives of the insurance industry, most-notably State Farm Defendants, specifically for the purpose of reducing collision repair costs.

367.    State Farm Defendants, Allstate Defendants, GEICO Defendants and Liberty Mutual Defendants each have representatives on CAPA's current board of directors.  In addition, the following individual are on CAPA's current board of directors: Mr. Clark Plucinski, the president of the Boyd Group, which operates Gerber Collision repair shops, a MSO that has a DRP with Allstate Defendants, State Farm Defendants and GEICO Defendants; Tim Adelmann of ABRA, Inc., which is a MSO like Gerber Collision that has a DRP with State Farm Defendants, Allstate Defendants, GEICO Defendants, USAA Defendants, Nationwide Defendants and Progressive Defendants.

368.    CAPA is a crucial cog in Defendant insurers' and other national property and casualty insurers' respective corporate policies of purchasing and demanding use of cheaper and federally unregulated aftermarket parts whenever possible.  Like IIHS, board membership for CAPA provides significant opportunities for Defendant insurers to meet and facilitate agreements, goals, expectations and mutually beneficial schemes regarding aftermarket parts usage.

369.    Defendant insurers have employed a widespread and unified campaign to convince the public and various state agencies that aftermarket parts are safe and interchangeable with OEM

parts.  Acceptance of this notion directly benefits Defendant insurers as it drastically reduces their respective payment amounts for claims from insureds and claimants.

370.    CAPA's partiality towards the Defendant insurers is evidenced by the fact that the insurance industry has financed CAPA and that CAPA openly functions to further the insurance industry's goal of reducing claims costs.

371.    Further evidence is that CAPA *decertifies* a substantial number of aftermarket parts due to poor quality despite the fact that CAPA purportedly tested and pronounced the same parts as adequate for use in collision repair.

372.    Last year, for example, CAPA decertified over a thousand aftermarket parts, many of them crash and safety parts, and many of them were for the most popular vehicles in the country. This included, among many others: Toyota Camery hoods and fenders; Honda Accord fenders, hoods and headlamp assemblies; Subaru Outback headlamp assemblies; BMW 3-Series hoods; BMW 5-Series hoods, bumper covers, fenders and fog lights; and Dodge Charger, Ford Edge, Ford Focus, Lincoln MKX, Mazda 6, Nissan Altima, Volkswagen Jetta and Honda Civic radiator supports.

373.    Through CAPA, Defendant insurers' representatives are positioned to enter into agreements affecting the body shop industry's pricing, supply and approval of parts for collision repair.  Defendant insurers utilize CAPA to ensure that there is a generous supply inexpensive aftermarket parts so that when Defendant insurers compel their usage, the Defendant insurers' respective claim payment amount is reduced.

<u>Motive to Conspire</u>

374.    Each individual Defendant insurer has an obvious motive to conspire to fix prices, boycott, punish noncompliant shops, and interfere with Plaintiffs'' businesses: Profit.

375.    Defendant insurers realize tremendous benefit from their illegal conduct.

376.    In 2013, State Farm reported a net income increase of 65%, resulting in a record high net worth of $75.9 billion.  State Farm' underwriting gain was $230-million.

377.    Those rounding out the market shareholders top-five list in 2013 include: Allstate, reported $2.3-billion as net income; GEICO, which reported $1.1-billion in profits; Progressive, which reported $1.16-billion in net income; and USAA, which reported $2.7-billion in net income.

378.    When Defendant insurers' collect money from their respective insured's, Defendant insurers invest the money until they are obligated to pay for claims or operating expenses and retain the profits from those investments.  The money collected but not paid is known as "float" within the industry.  Defendant insurers invest the float money and capitalize on their investment by illegally withholding payment from and/or reducing payment to Plaintiffs for work performed on Defendant insurers' insureds' and claimants' vehicles.

379.    State Farm Defendants, Allstate Defendants, Nationwide Defendants, Liberty Mutual Defendants, and GEICO Defendants are all invested in or invest through BlackRock, Inc.[41]

380.    Based upon available information and belief, Plaintiffs assert that discovery will provide additional evidence as to the remaining Defendant insurers' investments in and investments through BlackRock, Inc.

<u>BlackRock, Inc. and Service King</u>

381.    BlackRock, Inc. ("BlackRock"), is the largest asset management firm in the world. BlackRock also engages in private equity investing.

382.    BlackRock boasts on its website that it manages $4.32-trillion in assets, manages 7,700 portfolios and has twenty of the top twenty-five insurers as its investors.

383.    BlackRock holds majority ownership of Service King, a MSO collision repairer. BlackRock purchased majority ownership of Service King from private equity and asset management firm, Carlyle Group, which retains minority ownership.  There are currently thirteen Service King locations in Arizona, all of which are located in Maricopa County.  Service King is a DRP for State Farm Defendants, GEICO Defendants, Allstate Defendants, Hartford Defendants,

---

[41] Swiss Re is one of BlackRock's larger institutional investors. GEICO Defendants' parent company, Berkshire Hathaway, owns 3.01% of voting rights in Swiss Re.  BlackRock owns approximately 10.04% of voting rights.

Liberty Mutual Defendants, Progressive Defendants, Nationwide Defendants, and USAA Defendants.

384.   Service King owns Sterling Collision Centers ("Sterling"), which is also a MSO collision repairer. Service King purchased the collision centers from Allstate Defendants. In *Allstate Ins. Co. v. Abbott*, *supra*, Allstate's ownership of Sterling was found to violate a Texas state law prohibiting, among other things, insurers from owning repair facilities.

385.   Thus, when State Farm Defendants, GEICO Defendants, Allstate Defendants, Hartford Defendants, Liberty Mutual Defendants, Progressive Defendants, Nationwide Defendants, and USAA Defendants steer customers to MSOs that BlackRock owns, these Defendant insurers obtain a two-fold profit: a greater front-end profit realized from suppressed repair costs associated with repairs at Service King and Sterling;[42] and a back-end benefit via their investment through BlackRock.

386.   The more vehicles repaired at Defendant insurers' affiliated MSOs, the greater the return on investment.  Claim payments made to Service King, for example, ultimately result in a return on investment for State Farm Defendants, GEICO Defendants, Allstate Defendants, Liberty Mutual Defendants, Progressive Defendants, Nationwide Defendants, USAA Defendants and potentially other Defendant insurers.

387.   Based upon information and belief, discovery is likely to reveal that the other Defendant insurers invest in and/or through BlackRock; and, therefore, directly profit from steering customers away from Plaintiffs' businesses and towards investment portfolio holdings, such as Service King and/or Sterling collision repair centers.

<u>BlackRock and Paint and Materials</u>

388.   BlackRock, through BlackRock International Trust Company, N.A., owns a significant amount of shares in PPG Industries ("PPG"), which manufactures and sells automobile

---

[42] Service King, Sterling and other MSOs agree to accept reduced payment from these Defendant insurers in exchange for a higher-volume of business that Defendant insurers generate by steering customers away from Plaintiffs and similarly situated shops.

paint.  As of September 2014, BlackRock was the third highest shareholder of PPG, owning 5.7-million shares.[43]

389.    Upon information and belief, PPG offers substantial discounts to MSOs and non-MSO shops that are members of DRPs, sometimes up to seventy percent (70%).

390.    Upon information and belief, PPG withholds these substantial discounts from non-DRP shops, such as Plaintiffs.

391.    These discounts encourage MSOs and DRP shops to purchase paint from PPG.  At the same time, Defendant insurers, which routinely and uniformly cap paint and materials payments, refuse or reduce payment to Plaintiffs for paint, stating that their charges are excessive because other shops (*i.e.,* MSOs and DRPs shops) are able to perform paint tasks for less money and, therefore, the imposed paint cap is reasonable.

392.    Defendant insurers that hold investments in or invest through BlackRock obtain a two-fold profit by steering customers to MSOs and DRPs.  On the front-end, Defendant insurers suppress and reduce claim payments related to paint and materials on the ground that the costs above their caps are out of line with the purported market rate, thereby retaining funds they would have normally have had to pay out as claims.

393.    On the back-end, Defendants that invest with or through BlackRock share profits realized from PPC's increased sales of paint products.  Put another way, investor profits offset claim payments made to MSOs for paint and materials.

394.    State Farm Defendants, Allstate Defendants, Nationwide Defendants, GEICO Defendants, USAA Defendants and Liberty Mutual Defendants reap such dual-profits.

395.    Based upon information and belief, discovery is likely to reveal that the other Defendant insurers hold similar investments with BlackRock; and, therefore, similarly profit via investment holdings in PPG.

<u>BlackRock and Parts</u>

---

[43] BlackRock's share ownership in PPG has varied but overall 7 has steadily increased over the last several years, nearly doubling since June, 2011, when it owned 3 million shares. This increase in share ownership coincides with BlackRock's growing acquisition of MSO facilities, such as Service King.

396.    BlackRock also owns 8.55 million shares of LKQ Corporation ("LKQ").  LKQ is a leading supplier/seller of, what it terms, "recycled" auto parts, which are salvaged parts from junk yards.  LKQ's subsidiary, Keystone Automotive Industries, Inc. ("Keystone"), is the largest supplier of aftermarket (*i.e.,* imitation or counterfeit) parts in the United States.

397.    As previously detailed, salvaged and aftermarket parts commonly have significant safety, quality control, and performance issues when compared to OEM part.  But Defendant insurers uniformly write repair estimates specifying the purchase of repair parts from LKQ and/or Keystone and employ the illegal practices alleged herein to mandate Plaintiffs' compliance with the written estimates.[44]

398.    Defendant insurers' specify use of repair parts from LQK and/or Keystone even when the respective Defendant insurers' on-the-ground adjustor or estimator knows that the specified part is not available through either LQK or Keystone.

399.    When Plaintiffs either refuse to use the LKQ- or Keystone-sourced part, or the part is unavailable from LKQ or Keystone and Plaintiff must purchase the part from another source, Defendants insurers routinely refuse to compensate Plaintiffs for anything more than the part could have been purchased (either in reality or theoretically) from LKQ or Keystone.

400.    Defendant insurers, when considering their respective investments with or through BlackRock, obtain a three-fold profit from these actions:  First, Defendant insurers' suppression of parts prices results in Defendant insures retaining funds that would otherwise be paid out on claims to Plaintiffs.

401.    Second, Defendant insurers' unified and widespread practice of refusing to pay for labor and other costs associated with modifying salvaged and/or aftermarket parts to properly fit vehicles results in Defendant insures retaining funds that would otherwise be paid out on claims to Plaintiffs.

---

[44] Depending on the type of repair being performed, parts from either or both LKQ and Keystone may be required.

402.    Third, Defendant insurers that invest with or through BlackRock profit by sharing in LKQ's and its subsidiary's increased sales of products that Defendant insurers' mandate. Claims payments made for parts purchased from LKQ and Keystone are off-set by returns to the Defendant insurers as investment profits.

403.    State Farm Defendants, Allstate Defendants, Nationwide Defendants, GEICO Defendants, USAA Defendants and Liberty Mutual Defendants reap such trifold profits.

404.    Based upon information and belief, discovery is likely to reveal that the other Defendant insurers hold similar investments with BlackRock; and, therefore, similarly profit via investment holdings in LKQ and Keystone.

Necessity of Combination or Conspiracy

405.    Although several of the largest Defendant insurers invest with or through BlackRock, in the absence of group agreement, the profit motive would not be worth the effort in the absence of a combination or conspiracy amongst the Defendant insurers.

406.    A single insurer engaging in the actions described in this Complaint would generate such a small effect upon the large investments of the Defendant insurers that it would not noticeably alter investment returns. An increase in the number of insurers facilitating coordination of price fixing of labor rates and replacement parts, compelling use of substandard or dangerous replacement parts, compelling use of parts procurement programs, and boycotting body shops or illegally steering consumers away from body shops, including Plaintiffs' shops, that refuse to comply with either fixed prices or use of substandard or improper parts, results in an increase in the profit for all.

407.    In the absence of an agreement among the Defendant insurers, their individual actions would be contrary to their own best interests.  Indeed, such actions would substantially harm a lone Defendant insurer.

408.    Auto insurance companies, including Defendant insurers', insure risk and, when that risk is realized, are mandated to pay the loss incurred.  An auto insurer that regularly fails or refuses to pay for full and complete repairs, insists on using salvaged or aftermarket parts, or leaves

a vehicle unsafe (or less safe than the vehicle's pre-loss condition) to operate—based on fundamental socioeconomic and free-market principles—would lose customers to other insurers.

409.    This is particularly so in our modern world of instant communication.  Consumers are able to provide feedback about interactions with business to the entire world in the push of a button on Twitter, Facebook, Yelp, or the like.  Reports of an auto insurance company failing to pay for a complete repair a vehicle or of an auto insurance company's complete lack of concern for the issues previously mentioned would substantially damage both the reputation and the viability of the business.

Effects on Competition in the Body Shop Industry

410.    Defendant insurers' actions have effectively removed all competition from the collision repair industry and constitute an unreasonable restraint on trade.

411.    Defendant insurers and Plaintiffs do not compete against each other.  Plaintiffs' identifiable market product is auto collision repair while Defendant insurers' identifiable market product is insuring risk for automobiles.  Thus, Plaintiffs' competition is limited to collision repair facilities and Defendant insurers' competition is limited to other automobile insurance companies.

412.    But, due entirely to Defendants' illegal conduct complained of herein, there is no competition between Plaintiffs and other collision repair facilities or among Defendant insurers.

413.    Competition presumes a free and open market, where innovation is encouraged, but that is not the present state of the collision repair industry.  There have not been any economies or efficiencies created within the collision repair industry, prices have not decreased as a result of a dynamic market, and incentives have not been created.

414.    Furthermore, expansion is not rewarded and investments in capital equipment is risky.  Federal guidelines relating to gas mileage efficiency, however, require collision repair facilities, including Plaintiffs, to evolve to rapidly changing vehicle designs, which requires new equipment and training.

415.    Consumers have not benefitted from the absence of competition in the collision repair industry.  As alleged throughout, Defendant insurers steer customers away from Plaintiffs

and towards collision repair facilities that concede to Defendant insurers' demands to cut-corners during the repair process that, at best, reduce the quality of the work or, at worst, endangers the consumer's safety for Defendant insurers' sole financial benefit.  Indeed, Defendant insurers' widespread and unified conduct perpetuates a fixed-price/punishment system that disincentives quality workmanship, consumer safety and customer relationships.

416.    Defendant insurers' violations of state and federal law have effectively eradicated competition in the collision repair industry.  Defendant insurers' actions have had a wholly detrimental effect on the body shop industry and are detrimental to the public.

<u>Intentional Nature of Defendant Insurers' Wrongful Conduct</u>

417.    In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies, et al*, Docket No. 3106, upon a complaint filed in the Southern District of New York. The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act.  A copy of the consent decree is attached hereto as Exhibit 5, (referred to herein as "1963 Consent Decree").

418.    Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused. The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

419.    The 1963 Consent Decree provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops

for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

420.     The clear terms of the 1963 Consent Decree apply to and are binding upon "each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise."

421.     In 1964, Association of Casualty and Surety Companies, a defendant in Association of Casualty and Surety Companies, merged with AIA.

422.     As the successor organization upon completion of the merger in 1964, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the AIA and its members, and all other persons in active concert or participation with the AIA, whether or not an actual member of the AIA.

423.     In 1977, American Mutual Insurance Alliance, a defendant in Association of Casualty and Surety Companies, became Alliance of American Insurers in 1977 when membership was opened to stock and other non-mutual insurance companies. Alliance of American Insurers subsequently merged with the National Association of Independent Insurers to form PCI.

424.     As the successor organization upon completion of all mergers to date, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the PCI, its members, and all other persons in active concert or participation with the PCI whether or not an actual member of the PCI.

425.     NAMIC, a defendant in Association of Casualty and Surety Companies, remains intact and active. The terms and requirements of the 1963 Consent Decree are binding upon and enforceable against NAMIC and its members, and all other persons in active concert or participation with the NAMIC, whether or not an actual member of NAMIC.

426.     Defendant insurers, except Infinity, Safeway, Country Mutual, UAIC, and Mercury, are members of the contemporary associations and are still bound by the 1963 Consent

Decree. Nonetheless, Infinity, Safeway, Country Mutual, UAIC, and Mercury insurers are actively participating and are in concert with the other Defendant insurers and have knowledge of the 1963 Consent Decree. Thus, regardless of whether these particular Defendant insurers are member of any of the associations, they are individually bound to the terms and conditions of the 1963 Consent Decree.

427.    Upon information and belief, discovery will likely uncover information about Defendant insurers' membership in one or more of the three applicable trade associations or affiliations with the three applicable trade associations.

428.    Defendant insurers' actions violate the terms of the 1963 Consent Decree by effecting plans, programs or practices which have the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

429.    Defendant insurers were fully aware that their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

430.    Defendant insurers are liable to Plaintiffs for punitive damages.

## CAUSES OF ACTION

## COUNT I: VIOLATIONS OF THE SHERMAN ACT – PRICE FIXING

### (Against all Defendant insurers)

431.    Plaintiffs repeat and reallege the above allegations.

432. This Count is brought by Plaintiffs against all Defendants pursuant to 15 U.S.C. §§ 1, 15 to recover treble damages and other relief for Defendant insurers' violations of the antitrust laws.

433. Defendant insurers have engaged in unlawful contracts, combinations, and/or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

434. The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. vs. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

435. Defendant insurers agreed to reduce and/or eliminate competition, by among other things:

    a) Fixing prices at an amount that State Farm Defendants determine using a scientifically illegitimate methodology;

    b) Fixing prices at an amount that are unrelated to the actual prices that Plaintiffs and similarly situated body shops charge or publicly post;

    c) Fixing prices below rates that Plaintiffs and similarly situated body shops charge or publicly post;

    d) Fixing prices without conducting a statistically relevant survey to determine a legitimate market rate in the body shop industry within the State of Arizona;

    e) Mandating Plaintiffs and similarly situated body shops to accept the purported market rate while refusing to disclose, publish or otherwise make the survey results publicly available;

    f) Uniformly mirroring rate changes that State Farm Defendants dictate without conducting an independent statistically relevant survey to determine a legitimate market rate in the body shop industry within the State of Arizona;

g) Uniformly mirroring rate changes that State Farm Defendants dictate even though State Farm Defendants do not publish or make publicly available their survey results;

h) Exchanging information, including State Farm Defendant's survey results, so as to enable Defendants to monitor each other's pricing and price increases;

i) Uniformly excluding payment for the processes and procedures even when repair procedure and estimating databases and the ordinary practices and procedures of the body shop industry contradict the exclusion;

j) Attending regular meetings between Defendant insurers to discuss and strategize with each other regarding payment of body shop charges;

k) Enforcing collective market share and/or agreements with other Defendant insurers, to compel Plaintiffs' and other similar body shops' acceptance of fixed prices, which would otherwise be impossible in the absence of combination or conspiracy;

l) Enforcing collective market share and/or agreements with other Defendant insurers, to compel Plaintiffs' and other similar body shops' use of substandard or dangerous replacement parts, which would otherwise be impossible in the absence of combination or conspiracy;

m) Enforcing collective market share and/or agreements with other Defendant insurers, to compel Plaintiffs' and other similar body shops' to source parts, paint and materials from pre-designated sources or to use parts particular procurement programs, both of which confer direct and indirect financial benefits for all Defendant insurers;

n) Uniformly prohibiting—for the purpose of concealing their behavior—members of the body shop industry from attending meetings of between insurance representatives wherein body shop labor rates and database application and payment of procedures were discussed;

o) Uniformly making intentional misrepresentations and/or knowingly making false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' business; and

p) Uniformly threatening insurers and/or claimants with denial of coverage (or portions of available coverage) if the insurer and/or claimant persists in their efforts to patronize Plaintiffs' businesses.

436. The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendant insurers' arbitrary price ceilings, harming consumer choice and public interests, subjecting repair shops to Defendant insurers' collective control and supervision of prices.

437. Furthermore, Plaintiffs and other similarly situated body shops have been deprived of the benefits of free and open competition. Plaintiffs and similarly situated members of the auto collision repair industry are unable to engage in competitive business practices as the Defendant insurers have effectively and explicitly determined what their business practices will be.

438. The contracts, combinations and conspiracies described above are naked restraints of trade among horizontal competitors, the purpose and effect of which are to reduce output and/or harmonize or stabilize prices, and thus, are subject to per se condemnation under the federal antitrust laws.

439. Horizontal price fixing is per se illegal. *FTC v. Actavis, Inc*., 133 S. Ct. 2223, 2239 (U.S. 2013), *Leegin Creative Leather Prods. v. PSKS, Inc*., 551 U.S. 877, 886 (U.S. 2007), *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (U.S. 2006). No showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. Where there is a per se illegal price-fixing agreement, it is no defense that the agreement at issue did not have anticompetitive effects, or that defendant's motives were benevolent. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218 (U.S. 1940)

440.     Alternatively, the contracts, combinations and conspiracies described above are illegal restraints of trade under the rule of reason, in that the anticompetitive effects of the various agreements outweigh any pro-competitive justifications.

441.     The United States Supreme Court has held that direct evidence of an agreement is not necessary to establish a violation of the Sherman Antitrust Act. Some factors which have been held a sufficient showing of an agreement in violation of the Sherman Act include parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, FN4 (2007).

442.     Defendant insurers' actions constitute behavior that is likely not the result of chance, coincidence, or independent response to common stimuli or mere interdependence unaided by an advance understanding.

443.     As a direct and proximate result of Defendant insurers' contracts, combinations and conspiracies, Plaintiffs have been injured in that the reimbursement amounts for their services and products were lower than they would have been in a truly competitive market.

444.     Defendant insurers' and their co-conspirators' conduct affects interstate trade and commerce in the United States in that it has caused Plaintiffs and other collision repair facilities to be paid less than they otherwise would have be paid and a reduction in the quality workmanship and crashworthiness for consumers' repaired vehicles.

445.     Defendant insurers are continuing and will continue said offenses unless the relief herein prayed for is granted.

446.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II: VIOLATIONS OF THE SHERMAN ACT – BOYCOTT

### (Against all Defendant insurers)

447.     Plaintiffs repeat and reallege the above allegations.

448.    "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541 (1978). "It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim firms from competing, the arrangement is in purpose and effect a boycott. *Id.* at 543 (*citing* L. Sullivan, Handbook of the Law of Antitrust 231 (1977)).

449.    Defendant insurers have actively participated in, and gained economic advantage from, a common scheme, agreement, or conspiracy designed to pressure, intimidate, and/or coerce each of the Plaintiffs into complying with the Defendants' price-fixing scheme. This common scheme constitutes a continuing agreement, understanding, combination, and/or conspiracy to unreasonably restrain trade, so as to limit or exclude Plaintiffs' and customers' participation in the market.

450.    The common scheme involves multiple forms of illegal boycott activity including, *inter alia*, steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; economically coercive threats that use of Plaintiffs' services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendant insurers' referral and rating systems to limit or otherwise influence customer access to service providers. Each of these forms of conduct individually constitutes an unreasonable restraint of trade and a *per se* violation of the Sherman Act §1.

451.    Enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, has long been viewed as conduct supporting a finding of unlawful boycott. *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 544-5 (1978).

Case 6:14-md-02557-GAP-TBS Document 230 Filed 09/18/15 Page 83 of 90 PageID 2452

452.     Defendant insurers have enlisted, and continue to enlist, third-party consumers in need of auto repairs as unwitting participants in Defendant insurers' common scheme to coerce and punish Plaintiffs.

453.     Evidence of Defendant insurers' concerted boycotting against insurers includes, but is not limited to: all Defendant insurers making the same false statements, fraudulent misrepresentations and misleading innuendos about Plaintiffs to consumers who have identified Plaintiffs as their intended repair facility; refraining from disclosing quality of repair issues at preferred, compliant shops, such as Service King; timing of boycotting to engage with intentional punishment directed by one or two insurers and enlisting the other Defendants into boycotting a particular Plaintiff at the same time.

454.     Defendant insurers' ongoing conduct in furtherance of the common scheme to boycott, and thereby coerce and/or punish Plaintiffs, has had substantial negative impact on the Plaintiffs' business practices and relationships, the ability of customers to freely obtain safe and full repairs, and the functionality of the relevant market.

455.     Defendant insurers' knowledge of changed circumstances (*e.g.*, when a body shop leave another Defendant insurers' DRP or refuses to accept another Defendant insurer's pricing terms) followed with defamatory and misleading statements to drive customers away from the offending body shop, demonstrates agreement to boycott.  Absent an agreement to boycott, the unaffected Defendant insurers would not have knowledge and would not have reason to act as a concerted group upon the knowledge with malicious intent to harm the particular Plaintiff.

456.     Agreement is also demonstrated through the identical nature of the falsehoods and misrepresentations that the Defendant insurers utilized in their boycotting and steering of customers from Plaintiffs. The nearly identical nature of the wording leads to a reasonable conclusion that an agreement was reached as to the most effective statements to use to the greatest effect.

457.     Whether viewed under a *per se* rule or a rule of reason analysis, Defendant insurers' common scheme, which is detailed throughout this Complaint, acts to restrain trade and diminish competition and market functionality for Plaintiffs and consumers.

458.     As a direct and proximate result of Defendant insurers' illegal boycotting activity, Plaintiffs have been injured in that the reimbursement amounts for their services and products were lower than they would have been in a truly competitive market.

459.     Defendant insurers are continuing and will continue said offenses unless the relief herein prayed for is granted.

460.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## Count III: Tortious Interference with Business Relations

### (Against all Defendant insurers)

461.     Tortious interference with a business relation occurs where a plaintiff has a valid contractual relationship or business expectancy, defendant knows of the relationship or expectancy, and defendant intentionally interferes with the relationship or expectancy causing a breach or termination that results in damages to the party whose relationship or expectancy has been disrupted. *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 386, 710 P.2d 1025, 1041 (1985) *superseded on other grounds by statute*, Ariz. Rev. Stat. § 23–1501 et seq.

462.     Arizona recognizes two theories of liability under this cause of action: intentional and improper interference with a contract and intentional and improper interference with another's prospective contractual relationship. *United Metro Materials Inc. v. Florence Copper Inc.*, No. 1 CA-CV 06-0255, 2007 WL 5439750, at *2 (Ariz. Ct. App. July 12, 2007).

463.     The Defendant insurers, knowing of Plaintiffs' valid business relations and prospective business relations, intentionally engaged in actions and a course of conduct designed to interfere with and injure the Plaintiffs' valid business relations and prospective business relations. The Defendant insurers knowingly and intentionally steered and attempted to steer away from the Plaintiffs' through their repeated campaign of misrepresentation of facts, failure to verify

84

facts that damage or tend to cause damage to the Plaintiffs' business reputations before conveying the same to members of the public, implications of poor quality, poor efficiency, poor business ethics and practices, and unreliability.

464.    Defendant insurers' relayed the false and/or misleading information to both specific (examples previously alleged) and to an identifiable class of customers: Defendants' insureds and/or claimants, Plaintiffs' current customers, and customers that represented to Defendants insurers that Plaintiffs' businesses was their choice repair facility.

465.    The purpose of these actions was twofold: to punish the Plaintiffs who complained about or refused to submit to the various oppressive and unilateral price ceiling the Defendant insurers were enforcing upon them, and to direct potential customers of the Plaintiffs to other vendors who would comply with the maximum price ceilings that Defendant insurers unilaterally imposed.

466.    The Plaintiffs have been damaged by the Defendant insurers' malicious and intentional actions.  Plaintiffs are therefore entitled to compensation for these damages.

## Count IV: Unjust Enrichment

### (Against all Defendant Insurers)

467.    Plaintiffs repeat and reallege the above allegations.

468.    Unjust enrichment exists as a quasi-contractual obligation where services have been performed, the party receiving those services agreed to receive them, and there is an expectation of payment or compensation at the time the services were rendered. *Blue Ridge Sewer Improvement District v. Lowery*, 718 P.2d 1026 (Ariz. App. 1986).

469.    Plaintiffs have performed valuable services and expended material resources with the reasonable expectation of payment/compensation for those services and materials. This is Plaintiffs' business. Performing said services and expending material resources benefitted and enriched Defendant insurers and Defendant insurers' insureds/claimants for whom Defendant insurers are required to provide payment for repairs.

470.     Defendant insurers reserved the unilateral right to give permission for each Plaintiff to commence work until such time and place as Defendant insurers deemed appropriate. Although ultimate authority for such orders lies solely with the consumer, Defendant insurers officiously asserted that they were entitled to certain rights and privileges in advance of work actually commencing to preserve their own rights.

471.     Having reserved those right and affirmative extended permission and direction, the Plaintiffs were reasonably entitled to rely upon the belief an equitable contract had been formed and should be fully performed.

472.     It was and has always been foreseeable the Plaintiffs were not performing labor or providing services and materials without expectation of full payment. Defendants have acknowledged the essential elements of this cause of action and the concomitant obligation to compensate Plaintiffs by making partial payment. Plaintiffs have been substantially impoverished by Defendants' actions through loss of both revenue and the opportunity to build custom and trade with consumers who were maliciously steered away from utilizing their services.

473.     But Defendant insurers have simply taken the position that full payment may not be made unless they choose to provide it, regardless of any other factor or consideration and having fully exercised the extent of their rights, they have further enriched themselves at the expense of Plaintiffs by failing to compensate for work performed and materials expended upon the receipt of the Defendant insurers agreement work could commence.

474.     Plaintiffs have been harmed by Defendant insurers' action while the Defendant insurers have been enriched by the same.  Defendant insurers' actions have no legitimate business purposes other than to harm Plaintiffs and similarly situated repair facilities.

475.     There is no justification for Defendants retaining money that rightfully belongs to the Plaintiffs.

476.     Plaintiffs lack other recourse to cure the harm that Defendant insurers caused.

477.    Plaintiffs are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendant insurers in the form of unreimbursed payment for services and materials rendered from which Plaintiffs may make claims for restitution.

### Prayer for Relief

478.    As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted. The Plaintiffs therefore pray for the following relief:

A.    Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendant insurers' insureds and claimants as determined by a jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.    Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.    Treble damages, reasonable attorneys' fees and costs for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.    Injunctive relief prohibiting the Defendant insurers from further engaging in any of the following:

(1)    Placing into effect any plan, program or practice which has the purpose or effect of:

(a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

(b) fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection

therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2)     Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

(3)     Providing untruthful and/or unverified information to customers or other third-persons regarding the quality, cost, efficiency or reputation of any Plaintiff.

(4)     Prohibiting State Farm Defendants from altering or amending any Plaintiff responses to its market labor rate questionnaire without the express written permission of the affected Plaintiff.

F.     Punitive and/or exemplary damages sufficient to punish Defendant insurers for their intentional acts and deter each Defendant insurer and similar entities from pursuing this improper conduct in the future.

G.     Pre- and post-judgment interest at the highest rate allowed by law.

H.     Any additional relief the Court deems just and appropriate.


DATED: September 18, 2015

EAVES LAW FIRM

_s/Allison P. Fry_____
John Arthur Eaves, Jr.
Allison P. Fry
101 N. State Street
Jackson, MS 39201
Telephone: 601.355.7961
Facsimile: 601.355.0530
JohnJr@eaveslaw.com
Allison@eaveslaw.com

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Elaine A. Ryan (AZ 012870)
Van Bunch (AZ 009630)

Eric D. Zard (AZ 027431)
2325 East Camelback Road, Suite 300
Phoenix, AZ  85016-3422
eryan@bffb.com
vbunch@bffb.com
ezard@bffb.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Plaintiffs' Amended Complaint* was filed electronically on the 18th day of September 2015 and will be served upon all ECF-registered counsel by operation of the Court's electronic filing system. Parties and counsel may access this filing through the Court's system.

> *s/ Allison P. Fry*_____
> Allison P. Fry
> JOHN ARTHUR EAVES,
> ATTORNEYS AT LAW
> 101 N. State Street Jackson, MS 39201
> 601.355.7961 Tel
> 601.355.0530